# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| CCI ENVIRONMENTAL, INC., D.W. MERTZKE EXCAVATING & TRUCKING, INC., GLOBAL ENVIRONMENTAL, INC., PREMIER DEMOLITION, INC., | ) ) ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| CITY OF ST. LOUIS, ST. LOUIS AIRPORT AUTHORITY and AMBER GOODING, Director, in her Official Capacity; PHIL FINGERHUT, HARRY MOORE, STEVE LEWIS, and VLADIMIR MONROE, members of the Program Review Committee of the City of St. Louis, St. Louis Airport Authority in their official capacity, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

*This cause of action arises from Defendant's Minority and Women's Business Enterprise Program Certification and Compliance Rules that require Native Americans to show at least one-quarter descent from a tribe recognized by the Federal Bureau of Indian Affairs, whereas African Americans, Hispanic Americans, and Asian Americans are only required to "have origins" in any groups or peoples from certain parts of the world. This action alleges violations of Title VI of the Civil Rights Act of 1964, and the denial of equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution as these definitions constitute per se discrimination.*

Plaintiffs, CCI ENVIRONMENTAL, INC., D.W. MERTZKE EXCAVATING &

TRUCKING, INC., GLOBAL ENVIRONMENTAL, INC., and PREMIER DEMOLITION,

INC., by and through its attorneys, hereby files the following complaint against Defendants as

captioned above.

1

## I.  JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

2.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

3.  Plaintiff brings this action to redress per se discrimination pursuant to Title VI, 42 U.S.C. § 2000d et seq., as more fully set forth herein.

4.  This is also an action to redress the deprivation of Plaintiffs' constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

5.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since parties reside in this district and the events giving rise to the claims occurred in this district.

## II.  THE PARTIES

6.  Plaintiff  CCI ENVIRONMENTAL, INC. is a Missouri corporation doing business as a certified Minority Business Enterprise ("MBE") by the City of St. Louis.  The business is

owned, operated, and controlled by Minority Group Members who have at least fifty-one
percent (51%) of the ownership of the business, and who have day-to-day operational and
managerial control of the business and an interest in capital and earnings of the business
commensurate with their percentage of ownership of the business.   The President of CCI
ENVIRONMENTAL, INC. is Mark S. Briguglio.  Briguglio is a Minority Group Member
because he is a member of the American Indian tribe known as Northern Cherokee Nation as a
result of his Cherokee ancestors who hail from Texas County, Missouri.

7.  Plaintiff D.W. MERTZKE EXCAVATING & TRUCKING, INC. is an Illinois
corporation doing business as a certified Minority Business Enterprise ("MBE") by the City of
St. Louis.  The business is owned, operated, and controlled by a Minority Group Member who
has one-hundred percent (100%) of the ownership of the business, and who has day-to-day
operational and managerial control of the business and an interest in capital and earnings of the
business commensurate with their percentage of ownership of the business.   The President and
sole shareholder of D.W. MERTZKE EXCAVATING & TRUCKING, INC. is Jody Mertzke.
Mertzke is a Minority Group Member because she is a member of the American Indian tribe
known as Northern Cherokee Nation since her Cherokee ancestors originally hailed from
Oklahoma by way of Arkansas.

8.  Plaintiff GLOBAL ENVIRONMENTAL, INC.  is a Missouri corporation doing
business as a certified Minority Business Enterprise ("MBE") by the City of St. Louis.  The
business is owned, operated, and controlled by Minority Group Members who have at least
fifty-one percent (51%) of the ownership of the business, and who have day-to-day operational
and managerial control of the business and an interest in capital and earnings of the business

3

commensurate with their percentage of ownership of the business.   The President of GLOBAL ENVIRONMENTAL, INC.  is Vicki Dunn.  Dunn is a Minority Group Member because she is a member of the American Indian tribe known as Northern Cherokee Nation as a result of her Cherokee ancestors who are from Texas County, Missouri.

9.  Plaintiff PREMIER DEMOLITION is a Missouri corporation doing business as a certified Minority Business Enterprise ("MBE") by the City of St. Louis.  The business is owned, operated, and controlled by Minority Group Members who have at least fifty-one percent (51%) of the ownership of the business, and who have day-to-day operational and managerial control of the business and an interest in capital and earnings of the business commensurate with their percentage of ownership of the business.   The President of PREMIER DEMOLITION is William M. Buell.  Buell is a Minority Group Member because he is a member of the American Indian tribe known as the Northern Cherokee Nation since his Cherokee ancestors originally hailed from middle Tennessee.

10.  NORTHERN CHEROKEE NATION is an American Indian Tribe with contacts in what is now known as the State of Missouri since 1721.  The current Principal Chief is Kenn Grey Elk DesCombes.

11.  Defendant CITY OF ST. LOUIS, ST. LOUIS AIRPORT AUTHORITY is a governmental entity in the County of the City of St. Louis, State of Missouri.  The CITY OF ST. LOUIS, ST. LOUIS AIRPORT AUTHORITY operates the City of St. Louis Minority and Women's Business Enterprise Program ("M/WBE Program") through its governmental functions pursuant to Executive Order #28 and its relationship with the St. Louis Development

Corporation. The MBE Program is managed and operated by the Airport Assistant Director Community Programs ("Director"), Defendant AMBER GOODING, in her official capacity for the City of St. Louis, St. Louis Airport Authority.

12. Defendant, PHIL FINGERHUT, in his official capacity, is a member of the Program Review Committee of the City of St. Louis, St. Louis Airport Authority.

13. Defendant HARRY MOOORE, in his official capacity, is a member of the Program Review Committee of the City of St. Louis, St. Louis Airport Authority.

14. Defendant, STEVE LEWIS, in his official capacity, is a member of the Program Review Committee of the City of St. Louis, St. Louis Airport Authority.

15. Defendant, VLADIMIR MONROE, in his official capacity, is a member of the Program Review Committee of the City of St. Louis, St. Louis Airport Authority.

16. At all material times Plaintiffs were residents of the State of Missouri, except for Plaintiff D.W. MERTZKE which is a resident of the State of Illinois.

17. At the time of events complained of herein, Plaintiffs were business enterprises with MBE certification through Defendant CITY OF ST. LOUIS ("City").

18. At all material times, Defendant AMBER GOODING ("the Director"), in her official capacity, worked within the County of the City of St. Louis, State of Missouri.

19. During all material times, all Defendants were an agent and/or employee of Defendant City of St. Louis, St. Louis Airport Authority acting or failing to act within the scope, course, and authority of their employment and their employer.

## III.  HISTORY OF NORTHERN CHEROKEE NATION

20.  The first Cherokee Indians, led by Yuwi-usgaseti ("Dangerous Man"), came to the Cape Girardeau area in 1721.  They were granted permission to settle west of the Mississippi River by the Spanish Governor in New Orleans.

21.  "Dragging Canoe (a o  " AK>, pronounced Tsiyu Gansini, "'he is dragging his canoe") (c. 1738–February 29, 1792) was a Cherokee war chief who led a band of disaffected Cherokee against colonists and United States settlers in the Upper South. During the American Revolution and afterward, Dragging Canoe's forces were sometimes joined by Upper Muskogee, Chickasaw, Shawnee, and Indians from other tribes/nations, along with British Loyalists, and agents of France and Spain. The series of conflicts lasted a decade after the American Revolutionary War. Dragging Canoe became the preeminent war leader among the Indians of the Southeast of his time. He served as war chief of the Chickamauga Cherokee (or "Lower Cherokee") from 1777 until his death in 1792, when he was succeeded by John Watts." https://en.wikipedia.org/wiki/Dragging_Canoe

22.  Dragging Canoe "was the son of Attakullakulla ("Little Carpenter"), who was born to the Nipissing. He and his mother were captured when he was an infant, and they were adopted into the Cherokee tribe and assimilated. His mother was Nionne Ollie ("Tamed Doe"), born to the Natchez and adopted as a captive by Oconostota's household." https://en.wikipedia.org/wiki/Dragging_Canoe

23.  "They lived with the Overhill Cherokee on the Little Tennessee River. Dragging Canoe survived smallpox at a young age, which left his face marked. According to Cherokee

6

legend, his name is derived from an incident in his early childhood. Wanting to join a war party moving against a neighboring tribe, the Shawnee, his father told him he could stay with the war party as long as he could carry his canoe. He tried to prove his readiness for war by carrying the heavy canoe, but he could only manage to drag it."

https://en.wikipedia.org/wiki/Dragging_Canoe

24.  Dragging Canoe's Chickamauga Cherokee, who were also known as the lower town Cherokee, separated from the main body of Cherokee Nation in the Southeastern United States. The word Chickamauga is a term from the old language and no longer used "over hill dialect." In that dialect it translates to mean "River of Death," and was a reference to the Chickamauga creek that ran through Chattanooga, Tennessee.

25.  After the Treaty of Tellico Blockhouse in 1794, most of the Cherokee wars were over.  Their war spirit and resources were gone.  The encroachment of their land by white settlers and the United States government began in earnest and it became obvious to most tribal leaders that all was lost or soon to be.

26.  Dragging Canoe's prophetic words were coming true.  Years before, while attending the signing of the Henderson Treaty, which forced the Cherokee to relinquish a large tract of the Kentucky territory, Dragging Canoe spoke at the council fire.  He took his long lance, raked fire and coals in every direction and turned to his father, Attakullakulla, better known as Little Carpenter, and spoke these words:  "Like these embers the whites will scatter you to the four winds and you will be no more. But as for me, I have my young warriors about me and we will fight for every inch of land we lose and we will never sign the first Peace Treaty with these White Devils," and then turning to the white members of the Henderson Land Co. he said to

7

them, "Today you have stolen a fine land but you will find it's settlement dark and bloody," and thus the Chickamauga wars began in earnest.  https://en.wikipedia.org/wiki/Cherokee %E2%80%93American_wars

27.  The fate of the Cherokee Nation was now sealed though few realized it; but some did.  A small migration began across the Mississippi River into the boot heel region of southeast Missouri.  These migrants had been here before.  In the 1780s the Spanish, who owned the Louisiana Territory at the time, had established a lead mine called "Mine Lamott" in what is now Farmington, Missouri.  Some of the Lower Town Cherokee along with some of the other Overhill Clans, together, would raid the mining community and on one occasion in 1791 completely wiped out the Spanish miners and carried off everything of value.  The Governor General of this area, Baron Carondolett was forced to send a letter to King Louis of Spain informing him that the lead shipments were curtailed for now and he requested troops to deal with these "Chalaques," which is from a Spanish spelling and Cherokee pronunciation.  The word came from Spanish explorer Hernando DeSoto's guides in 1530 when the Spanish were the first Europeans to contact the Cherokee.  It meant "those of a different tongue."

28.  King Louis sent back a message to "treat with these savages" and in 1793 a treaty was signed between the Spanish and a group of southeastern tribes, Dragging Canoe's Cherokees being the main force.  Other groups included the Choctaws, Chickasaw, Creeks, Alabama, Mobil, Biloxi, Tuscalosas and more.  The Spanish thinking was to obtain a large force of paid mercenaries who required very little assistance from Spain except for arms and munitions.  These groups were given full autonomy to raise havoc whenever and wherever they wished.  They were also given the right to settle in Spanish Territory.

29.  Since most of the fighting had ended by 1796-1798, many Chickamauga's and Over Hill survivors permanently migrated into southeast Missouri.  They kept to the old traditional ways of Cherokee society while adapting the more modern farming methods of the time.  They began to grow large fields of corn and cotton and immense gardens.  Around this time, they began to adopt white or Christian surnames.  They would assume any name that sounded good to them from any white they came across.  These surnames would soon number in the thousands.

30.  By the time the French had acquired the Spanish Territory and sold it to the United States in 1803, there was a growing contingent of Cherokees in southeast Missouri and northeast Arkansas that had less and less social interaction with their eastern countrymen.

31.  As Missouri became a territory and eventually a state these people would come to be known as the "Eastern Cherokee West of the Mississippi."  These people flourished in the rich bottomland soil of the Mississippi, until late one night in 1811 the ground began to shake.  The New Madrid Earthquake was one of the most powerful earthquakes to strike the United States.  Some of the most powerful aftershocks lasted until 1812.  The river bottom ground rolled like ocean waves.  Whole communities were swallowed up and graveyards spit up their dead.  The Cherokee determined that this ground was now haunted, and they made the decision to leave.  A large group followed Chief DuWali, known as the "Bowl" because of his haircut, into central Arkansas, south of Little Rock.  Bowl's group moved from Central Arkansas to east Texas, to the Dallas area and eventually across the Rio Grande river into Mexico about 145 miles west of Laredo to a town called Zaragoza, where they still reside today.

32.  In 1812, following the creation of the territories of Missouri and Arkansas by the

9

United States government, the Cherokees were permitted to form a permanent settlement area on the upper Arkansas River.

33.  On July 8, 1817, the Treaty of the Cherokee Agency (also known as the Treaty of Turkeytown) was signed by thirty-one leaders from Cherokee tribes in Alabama, Georgia, North Carolina, and Tennessee, as well as by fifteen Cherokee chiefs from Arkansas, and by Major General Andrew Jackson and Governor McMinn of Tennessee.  This treaty which involved Cherokees living in Missouri and Arkansas and the government of the United States of America gave the Cherokee land "acre for acre" in the White River and Arkansas River basins to replace land ceded to the government in the east.  This was the first formal recognition of the Western Cherokee by the government of the United States.

34.  Another group moved into northern Arkansas and from 1817 until 1828 they were given the White River Reservation, complete with two Indian agents.  It is hard to find anyone from an old family in the northern quarter of Arkansas that doesn't have Cherokee ancestors.

35.  Another group took a trail west along what is now known as Mo. Hwy. 32.  Some of this group stopped and settled in either Buffalo, Missouri or Bolivar, Missouri.  But most settled in the Stockton Lake area.  Several small Cherokee communities survived until the land was bought up by the Army Corps of Engineers and then inundated by Stockton Lake. See https://mostateparks.com/page/55004/general-information

36.  The Northern Band sometime called the Green band for leader Benjamin Green started up north what is now Mo. Hwy. 61 to what is now in the St. Louis area.  A few settled in West County, St. Charles area.  Benjamin Green and his large family settled along the Missouri River and Green Bottom Rd.  They soon saw the writing on the wall, packed up and

headed further west, leaving behind a family burial ground in the Wentzville area. One half of Benjamin's dog trot style log cabin is preserved in the historical area at the Ameristar Casino in downtown St. Charles, Missouri. The current Principal Chief of the Northern Cherokee Nation, Chief Kenn Grey Elk DesCombes and his wife, replaced the bottom or sill logs in 2004.

37. The Green family finally settled in Columbia, Missouri area and the surrounding areas. Several families settled in the Sturgeon area. A cemetery is still maintained north of Columbia, Missouri, know as the Naylor Cemetery. This is where Benjamin Green is buried. Every cemetery in the area has many Cherokee grave sites.

38. In 1834, the Northern band decided to try and unite the old tribe. Benjamin Green and a supporting party made the long trip to both the Sac River band in western Missouri and the White River band spread throughout the northern one third of Arkansas. Despite long and persuasive talks, and the fact that everyone was kin to everyone else, the talks failed. But Benjamin Green refused to quit. With the support of some of the other large families, notably the Adams, Neals, Foxes, Walkers, Towees, Browns, and hundreds of others, in 1835, Benjamin Green tried again. And because of so much interaction between all of the clans of the three bands Benjamin was successful. All three bands came together and Benjamin Green was elected first "Principal Chief."

39. In 1838, Cherokee school funds, allocated by the federal government were still being sent to fund schools in Missouri.

40. On February 27, 1845, the State of Missouri's Thirteenth General Assembly passed a law that forced the Northern Cherokee Nation to become an underground society. The 1845 law forbade Cherokees or any other Indians from residing in the state under penalty of fines

and imprisonment.  Despite legal efforts like these, the Northern Cherokee Nation managed through the years to maintain its tribal connections from it's first settlement.  This was not uncommon in the face of hostile laws and communities.  Tribes decided that the best way to survive was to take their community underground, practicing their religion and social traditions in secret.  See, e.g., Duane Champagne, *American Indian Societies: Strategies And Conditions Of Political And Cultural Survival* (2d Ed. 1989).

41.  In 1898, John Harvey Neal was elected Chief, and was replaced in 1934 by Everett Jess Harris, a college-educated scholar.  Moving into modern times, the Principal Chiefs were David Quinton, Beverly Baker, Elva Belts, Carl Grey Owl Griggs, Phillip Hawk Gazer Glascock, and finally the current Principal Chief, Kenn Grey Elk DesCombes.

42.  The tribe or Nation as it should be known has transitioned from the Eastern Band of Cherokees West of the Mississippi, up through the Northern Band and then the Northern Cherokee Nation of Missouri and Arkansas, and finally, simply now known as The Northern Cherokee Nation.

43.  The Northern Cherokee Nation is comprised of the descendants of the first Cherokee to settle in Missouri and Arkansas.  Their membership has used the Cherokee language consistently since that time.

44.  The Northern Cherokee Nation has a currently operating government consisting of the Principal Chief Kenn Grey Elk, a Deputy Chief, a Secretary-Treasurer, a Speaker of the Council, and representatives of the people called council members, and a council of elders.The Northern Cherokee Nation first ratified a working constitution in 1895 in Moberly, Missouri, and with revisions has operated under a constitution since that time.  The order of leaders since

that time is: John Harvey Neal until 1934, Everett Jesse Harris 1934-1981, David Quentin 1981-1984, Beverly Baker 1984-1990, Elva Beltz 1990-1994, Carl Grey Owl Griggs 1994-2006, Phil Hawk Gazer Glasscock 2006-2007, and Kenn Grey Elk DesCombes from 2007 until the present-day.

45. For years, the United States recognized Cherokees in Missouri and Arkansas as Indians, negotiated and carried out treaties with them, and in all other ways recognized them as Cherokee Indians. For example, *The Columbia Daily Tribune* recorded a visit by a representative of Guyon Miller from the Court of Claims on August 21, 1908. (See Exh. No. 1). Assistant Commissioner Black was in Columbia, Missouri, that day to take testimony from descendants of Gardiner Green, a Cherokee who never went west during the removal period and remained in Missouri. Congress approved $4,500,000 to distribute among Green's descendants for the shares they didn't receive when Indian lands were taken by the United States in 1835.

46. The following record taken from the United States Court of Claims shows that Guion Miller, the special commissioner of the Court described in the *The Columbia Daily Tribune* article above, utilized the John Drennan 1851 roll of Western Cherokees to compile his list of Cherokees eligible for compensation under the Court's May 18, 1905, ruling:

**123.8 Records of the Guion Miller Enrollment Of Eastern Cherokees 1835-1920**

**History:** United States Court of Claims acquired jurisdiction, pursuant to an act of July 1, 1902 (32 Stat. 726), over claims arising under treaty stipulations with the Cherokee tribe. Three suits were brought against the United States under the Treaty of New Echota (May 23, 1836) and the Treaty of Washington (Aug. 6, 1846): *The Cherokee Nation v. The United States* (general jurisdiction case 23199), *The Eastern and Emigrant Cherokees v. The United States* (general jurisdiction case 23212), and *The Eastern Cherokees v. The United States* (general jurisdiction case 23214). The court ruled in

favor of the Eastern Cherokees, May 18, 1905, and directed the Secretary of the Interior to identify those persons eligible to share a special Congressional claims compensation appropriation of June 30, 1906. Guion Miller, first as a special agent of the Department of the Interior, and after April 29, 1907, as a special commissioner of the Court of Claims, compiled a roll of eligible persons, which he submitted with a report to the court on May 28, 1909. Miller submitted a supplemental roll and report, January 5, 1910, containing additional names. The rolls were approved by the court and payment authorized, March 15, 1910.

In compiling his lists, Miller utilized earlier rolls, including those prepared by Interior Department special agents Alfred Chapman, Eastern Cherokees, 1851; **John Drennan, Western Cherokees, 1851**; and Joseph G. Hester, Eastern Cherokees, 1884.

**Textual Records:** Case files, 1906-11. Eastern Cherokee applications, 1906-9, with index, n.d. Correspondence, 1906-11. Transcripts of testimony, 1908-9. Receipts for Treasury warrants, 1910-11. Guion Miller reports, 1909 and 1920. Roll of Eastern Cherokee (Miller), 1909. Supplemental roll (Miller), 1910. Hester roll, 1884, with index. Chapman and Drennan rolls, 1851, with consolidated index. **Old Settler (Western Cherokee) roll, 1851**. Index to census enrollment of Eastern Cherokees ("Eastern Cherokee Roll"), 1835.

**https://www.archives.gov/research/guide-fed-records/groups/123.html#123.8**

47.   American Indian tribal recognition in the United States most often refers to the process of a tribe being recognized by the United States federal government, or to a person being granted membership to a federally recognized tribe. There are 573 federally recognized tribal governments in the United States.  Non-Acknowledged Tribes are tribes which have no federal designation as sovereign entities. This is not to be confused with the recognition of Native Americans in the United States which are defined by the Bureau of Indian Affairs as any descendant of the Indigenous peoples of the Americas which is a US citizen.  Federally Non-Recognized tribes refers to a subgroup of non-acknowledged tribes which had some sort of recognition by the British, Spanish, or French prior to the formation of the United States or by the United States but which were determined by the government to no longer exist as an Indian tribe or no longer meet the criteria for a nation to nation status.

48.  Over the years, the United States Government at various times created rolls of persons who were entitled to receive monies or allotments from the federal government as a result of treaties or because they resided on a reservation.  One example of these rolls are what is known as the Dawes Rolls or the Final Rolls related to the Five Civilized Tribes.   The General Allotment Act or Dawes Act was passed on February, 8, 1887.  These rolls were never meant to be an exhaustive listing of who was or wasn't an American Indian living within the boundaries of the United States.  For example, the Dawes Act specifically states that it was "An Act to Provide for the Allotment of Lands in Severalty to Indians on the Various Reservations (General Allotment Act or Dawes Act), Statutes at Large 24, 388-91 . . . Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in said reservation in severalty to any Indian located thereon . . . ."   In other words, the Dawes Roll is a list of those members of the Five Civilized Tribes who removed to Indian Territory (Oklahoma) during the 1800's and were living there during the time the Dawes Commission took its census.  If an Indian were not living in Indian Territory during 1898-1914, he would not be listed on the Dawes Roll.  Only those Indians who received land under the provisions of the Dawes Act are listed.

15

49.  The Northern Cherokee Nation has been unfairly denied recognition by the United States government.

## IV.  RECOGNITION OF NORTHERN CHEROKEE NATION AS AN AMERICAN INDIAN TRIBE

50.  The Northern Cherokee Nation has been recognized as an Indian Tribe by both the legislative and executive branches of the State of Missouri.

51.  On June 22, 1983, Governor Christopher S. Bond recognized the Northern Cherokee Nation as an American Indian Tribe within the boundaries of the State of Missouri. (See Exh. No. 2).

52.  On March 8, 1984, the Missouri House of Representatives passed a Resolution where it noted that the Governor of the State of Missouri had fully recognized the Northern Cherokee Nation as an American Indian tribe within the boundaries of the state.  (See Exh. No. 3).

53.  On July 26, 1985, the Northern Cherokee Nation submitted a letter of intent to petition for Federal acknowledgment.  Priority #100 was assigned to this letter of intent to petition by the Bureau of Indian Affairs.  (See Exh. No.  4).

54.  In the 1990s, Chief Grey Owl Griggs continued the process for the Northern Cherokee Nation to become a federally recognized tribe by the United States Government.

55.  While pursuing the federal recognition process with the Bureau of Indian Affairs, Chief Grey Owl enlisted the assistance of other American Indians and tribes – federally recognized, state- recognized and non-recognized –  to help Northern Cherokee Nation achieve sovereign-to-sovereign recognition with the United States as an American Indian tribe.

56.  Cherokee Nation is a federally recognized tribe based in Tahlequah, Oklahoma.   It has a Principal Chief and a tribal council.  Today, its Principal Chief is Chuck Hoskin, Jr.  In the 1990s, Chief Grey Owl met with its tribal council to discuss federal recognition of Northern Cherokee Nation.  Chief Grey Owl met with members of Cherokee Nation during that time, including meetings with Chuck Hoskins, who was the District 7 representative on the Cherokee Nation tribal council.   This Chuck Hoskins is not the man with the same name who is Principal Chief of Cherokee Nation today. As a result of these meetings, Hoskins wrote a letter to Chief Grey Owl on June 13, 1998, expressing his opinion that Northern Cherokee Nation should receive federal recognition.  (See Exh. No. 5)

57.  In the 1990s, Chief Grey Owl began – and Chief Grey Elk has continued to this day – a relationship with the Waccamaw People, a South Carolina state-recognized tribe.  Chief Grey Owl and Chief Harold "Buster" Hatcher of the Waccamaw People worked on the White House Working Committee for the Recognition of All Indian People.  (See Exh. No. 6).   The tribe recognizes the Northern Cherokee Nation as an American Indian tribe and has continued with inter-tribal interactions to promote each other's tribe.  Chief Hatcher has worked extensively with Chief Grey Elk and has invited Chief Grey Elk yearly to participate and lead events in its annual pauwau in South Carolina. (See Exh. No. 7).

58.  On April 24, 1998, Benny Smith, a revered Cherokee elder who was later honored by Principal Chief Chad Smith of The Cherokee Nation in 2007, wrote a memo to Chief Carl Griggs expressing his opinion that Northern Cherokee Nation should be recognized as a tribe. (Exh. No. 8).  Smith explained that the Northern Cherokee Nation – just like the Keetoowahs – had to go "under-ground or conceal from the public what they truly were, - Indians

(Cherokees)." (*Id*.)

59.  In 2007, The Cherokee Nation honored nine Cherokee citizens for their dedication to Cherokee people and culture with the Principal Chief's Leadership Award.  Principal Chief Smith was quoted in a Tulsa newspaper saying that  "[t]he Cherokee Nation believes that the strength of our future lies in our communities." *Tulsa World*, April 18, 2007.  Chief Smith said that  "[t]hese people were chosen to receive the leadership award for their guidance and dedication to Cherokee heritage and communities." *Tulsa World*, April 18, 2007.  One of those Cherokee citizens honored was Benny Smith, a member of the ancient Keetoowahs of the Cherokees.  "Benny Smith was raised in the traditions, practices, customs and values of Keetoowah life. With Cherokee as his first language, Benny has taught four college semesters of the Cherokee Language Courses I, II and III. The grandson of Red Bird and Lucy Fields Smith, he was educated by the Cherokee elders in the ancient Cherokee ceremonial and spiritual customs. He completed his teaching certification in 1962 and received his Master's Degree in 1966. During his educational career, he has taught at small schools in Alva, Keys and Waynoka and went on to coach at Haskell Indian Nations University from 1971-2002. Benny enjoys hunting, shoeing horses and translating Cherokee language documents. Smith lives a very spiritual life and is a revered Cherokee elder." *Tulsa World*, April 18, 2007.

**V. APPLICABLE LAW AND POLICY**

60.  Title VI, 42 U.S.C. § 2000d et seq., was enacted as part of the landmark Civil Rights Act of 1964. It prohibits discrimination based on race, color, and national origin in programs and activities receiving federal financial assistance.

61.  Title VI is implemented through the Code of Federal Regulations. 28 C.F.R. §

42.101 et seq.

62.  In *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)), the United State Supreme Court held that an "implied private right of action" existed under Title VI such that private individuals may sue to remedy instances of intentional discrimination.

63.  Injunctive relief where a party seeks a temporary restraining order or an injunction ordering a recipient to do or not do something is one of the most common forms of relief sought and received in a Title VI private right of action.  *See, e.g., Sandoval*, 532 U.S. at 279 ("[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages.")

64.  To obtain a permanent injunction, the moving party must demonstrate:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2010); *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015)

65.  The Supreme Court held in *Barnes* that private individuals may obtain compensatory monetary damages for claims of intentional discrimination under Section 601 of Title VI. *Barnes*, 536 U.S. At 186-87.  This is well-settled law.  See e.g. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014); *Yakin v. Univ. of Ill.*, 508 F. Supp. 848, 852 (N.D. Ill. 1981), *aff'd*, 760 F.2d 270 (7th Cir. 1985); *Shore v. Mirabilio*, Civil No.: 3:16-cv-2078 (VLB), at *13-14 (D. Conn. Mar. 29, 2018).

66.  The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

## VI.  COMMON ALLEGATIONS

67.  On or about September 15, 2011, the City's Program Office issued Certification and Compliance Rules for the City's Minority and Women's Business Enterprise Program that was approved by the St. Louis Development Corporation ("Certification and Compliance Rules"). (Exh. No. 9).  On page five of the rules, the City defines Minority Group Members differently depending on one's racial classification.  The City's rules allow African Americans, Hispanic Americans and Asian Americans to meet the definition of a Minority Group Member by simply having "origins" within a group of peoples, whereas Native Americans are restricted to those persons who have cultural identification and can demonstrate membership in a tribe recognized by the Federal Bureau of Indian Affairs.

68.  In 2019, the Board of Directors of the St. Louis Economic Development Partnership, which is an economic development agency of the City of St. Louis and St. Louis County Government, issued an open request for qualifications of professional services from MBE and WBE firms.  (Exh. No. 10).  Exhibit A attached to the RFQ defined Minority Group Members.  It defined "Native Americans" as "persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians." (Compare Exh. No. 9 at 5 with Exh. No. 10, Exhibit A).

## A.  Removal of MBE Certification

69.  At all material times, the City was receiving federal funding, as contemplated by Title VI, 42 U.S.C. § 2000d et seq.

20

70. The City's Certification and Compliance Rules are *per se* intentional discrimination against Native Americans and the current application of the Certification and Compliance Rules have resulted in the deprivation of Plaintiffs' constitutional, statutory, and common-law rights.

71. In early 2019, Plaintiff PREMIER DEMOLITION INC. began the renewal process for its MBE certification with the City on February 18, 2019, before its anniversary date of March 25, 2019. Buell and his staff provided all the necessary documentation to Gooding on or before March 25, 2019. Gooding and her staff refused to process the Plaintiff's MBE renewal. Buell finally received confirmation from Gooding in an email on May 9, 2019, that his company's renewal would not be issued because of the pending review of the company's MBE certification by the City. The City's Certification and Compliance Rules do not allow for such a delay. The failure of the City to issue Plaintiff its renewal certificate caused the State of Missouri to suspend its MBE certification with the State as of May 3, 2019.

72. On or about September 15, 2011, the City's Program Office issued Certification and Compliance Rules for the City's Minority and Women's Business Enterprise Program that was approved by the St. Louis Development Corporation ("Certification and Compliance Rules"). On page five of the rules, the City defines Minority Group Members differently depending on one's racial classification. The City's rules allow African Americans, Hispanic Americans and Asian Americans to meet the definition of a Minority Group Member by simply having "origins" within a group of peoples, whereas Native Americans are restricted to those persons who have cultural identification and can demonstrate membership in a tribe recognized by the Federal Bureau of Indian Affairs.

73.   Gooding issued notices to each Plaintiff that she intended to ask the City's Program Review Committee ("PRC") on June 6, 2019, at a hearing between 1 p.m.  and 4 p.m. to decertify the MBE status for each Plaintiff because their membership in the Northern Cherokee Nation disqualifies each company from Minority Group Membership because the Northern Cherokee Nation is not a federally recognized tribe by the Bureau of Indian Affairs.

74.   Before the hearing, the City of St. Louis and the Plaintiffs agreed that the Plaintiffs would not seek a temporary restraining order halting the meeting of the PRC.  The basis for the agreement was that if the PRC decided to decertify the Plaintiffs, the City would not implement the decertification until the Plaintiffs could get a ruling on their request for a preliminary injunction to halt the decertification process.  The City and the Plaintiffs did not discuss the timing of when that request for preliminary injunction would be filed.   The City implemented the decertification of the Plaintiffs before the filing of this complaint for injunctive relief because it took the position that the Plaintiffs had taken too long to file their action.

75.   The PRC met on June 6, 2019, and received the Plaintiffs evidence and argument that the proposed decertification was discriminatory and unconstitutional, including a draft version of this complaint that explained how the proposed actions were unlawful discrimination under federal statutory and constitutional law.  Later that day, after the hearing, the PRC reconvened and voted to decertify the Plaintiffs firms.

76.   The PRC mailed letters to the Plaintiffs on June 12, 2019, informing them of the decision to decertify the firms.

77.   The Plaintiffs timely filed an administrative appeal on or about July 12, 2019, and the PRC filed its response to the Administrative Review Officer ("ARO") on August 15, 2019.

22

78.  On September 20, 2019, the ARO upheld the decision of the PRC to decertify the Plaintiffs firms.

79.  The City's policy, on its face, treats Native Americans differently than African Americans, Hispanic Americans and Asian Americans on the basis of race because it allows those groups to simply claim an origin from one of those groups of people to qualify as a Minority Group Member, but does not allow Native Americans to qualify in the same way. This is *per se* intentional discrimination by the City in violation of Title VI and the Fourteenth Amendment.

80.  As a direct and proximate result of the intentional discrimination by the City in the application of its Certification and Compliance Rules, as well as violations of Plaintiffs' Fourteenth Amendment rights, Plaintiffs have suffered loss of business, loss of standing in their community, and damage to their reputation by the City's decision to decertify the MBE status of these companies.

**COUNT I**
**VIOLATION OF TITLE VI**
**(42 U.S.C. § 2000d et seq.)**
**(City's discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance)**

Paragraphs one through 80 are incorporated by reference as if stated in full herein.

81.  The Defendants City of St. Louis and St. Louis Airport Authority treated Plaintiffs differently based on their race and national origin in violation of Title VI  of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.("Title IV"), because a) Plaintiffs are members of a protected class; and b) the City's policy treats Native Americans differently than African Americans, Hispanic Americans and Asian Americans on the basis of race and national origin

because it allows those groups to simply claim an origin from one of those groups of people to qualify as a Minority Group Member, but does not allow Native Americans to qualify in the same way.

82.  Defendants' decision to decertify these companies on the basis of this policy, on the basis of their race and national origin, subjects them to discrimination in violation of Title VI.

83.  This policy and/or practice constituted disparate treatment of Native Americans versus other minority peoples.

84.  As a direct and proximate result of the intentional discrimination by the City in the application of its Certification and Compliance Rules, Plaintiffs have suffered loss of business, loss of standing in their community, damage to their reputation by the City's decision to decertify the MBE status of these companies, and incurred attorney's fees and costs.

85.  Defendants'  decision to decertify these companies is outrageous and shows a pattern of reckless indifference to their rights under Title VI.

**COUNT II**
**1983 VIOLATION AS TO CITY OF ST. LOUIS AND GOODING, Director, and FINGERHUT, MOORE, LEWIS, and  MONROE, members of the Program Review Committee of the City of St. Louis, St. Louis Airport Authority**
**(42 U.S.C. § 1983)**

Paragraphs one through 80 are incorporated by reference as if stated in full herein

86.  Under the Fourteenth Amendment, Plaintiffs had the same rights as other minority contractors to the Equal Protection of Laws in the determination of their minority status.

87.  Defendants Gooding and Defendant members of the PRC are state actors acting under the color of state law.

88.  Defendants each subjected Plaintiffs to violations of their rights as other minority

24

contractors to the Equal Protection of Laws in the determination of their minority status by using a different standard to determine whether they should qualify as a Minority Group Member under the City's MBE Certification and Compliance Rules.

89.  The City's policy and practice constitute disparate treatment of Native Americans.

90.  Defendants Gooding and Defendant members of the PRC are and were at the time of the events complained of within, policymakers for the purpose of implementing the City's unconstitutional policy and practice.

91.  As a direct and proximate result of the City's deliberate indifference to their rights under the Fourteenth Amendment,  Plaintiffs have suffered loss of business, loss of standing in their community, and damage to their reputation by the City's decision to decertify the MBE status of these companies, and incurred attorney's fees and costs.

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Defendant City and Defendant Gooding and Defendant members of the PRC, as follows:

A. Compensatory damages for Plaintiffs' business losses, loss of standing in their community, and damage to their reputation;

B. Punitive damages;

C. Injunctive relief requiring Defendant City to strike its definition a Minority Group Member under its policy and rewrite it in a non-discriminatory manner; and reinstate the MBE certification of each Plaintiff;

D.  Statutory interest;

E.  Costs; and

F. Reasonable attorney fees under Title VI and 42 U.S.C. § 1988(b).

## <u>JURY DEMAND</u>

Now Comes Plaintiffs, by and through its attorneys, and demands a trial by jury.


RESPECTFULLY SUBMITTED,

GHIO LAW FIRM LLC

By: _____
 Matthew J. Ghio, #MO44799
 3115 S. Grand Blvd., Suite 100
 St. Louis, MO 631118
 (314) 707-5853
 (314) 732-1404 FAX
 *Attorneys for Plaintiff*