**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

CCI ENVIRONMENTAL, INC., et al.,   )
   )
         Plaintiffs,   )
   )
v.   )     **Case No. 4:19-cv-03099-RWS**
   )
CITY OF ST. LOUIS, *et al*.,   )
   )
         Defendants.   )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CITY OF ST. LOUIS MOTION FOR SUMMARY JUDGMENT

Defendant City of St. Louis ("Defendant City"),[1] by and through counsel, hereby submits this memorandum of law in support of its motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. In support thereof, the following statements are made:

### INTRODUCTION

Plaintiffs CCI Environmental, Inc. ("CCI"), D.W. Mertzke Excavating & Trucking, Inc. ("D.W. Mertzke"), Global Environmental, Inc. ("Global Environmental"), Premier Demolition, Inc.("Premier"), and Advanced Environmental Services, Inc. ("AES")(collectively, "Plaintiffs") allege, pursuant to Title VI of the Civil Rights Act of 1964, Title VI, 42 U.S.C. § 2000d et seq. and the Fourteenth Amendment of the United States Constitution, that Defendant City

---

[1] Defendant City is the only remaining defendant.  See ECF 14. With the Court's approval, the parties agreed to submit cross-motions for summary judgment to obtain a ruling on the threshold legal issue of whether the plaintiffs' decertification contravenes Title VI of the CRA of 1964 and the Equal Protection Clause of the Fourteenth Amendment.  See ECF 25 as amended.  A subsidiary issue, in defendant City's view, is whether plaintiffs can show any entitlement to prospective declaratory and injunctive relief, in light of the pendency of new rules providing plaintiffs with an alternative route to certification as minority-owned business enterprises ("MBEs").

discriminated against them based on their race, color and national origin through Defendant City City's Minority and Women Owned Business Enterprises (M/WBE) Program. Plaintiffs allege that the eligibility requirements for entities seeking certification as a disadvantaged minority business due to Native American ancestry is a violation of the Equal Protection Clause of the Fourteenth Amendment. With the exception of AES, all Plaintiffs were at one time certified as M/WBEs through Defendant City City's local program.  The basis of certification of Plaintiffs as MBEs was plaintiffs' claim to disadvantaged minority status by reason of their identification as Northern Cherokee Nation Native Americans.  See Amended Complaint [ECF 3] ¶¶----.  The question of  a Plaintiff's status as either a WBE or a "disadvantaged business enterprise" or "DBE" is not at issue in this cause, although the City's DBE program has some relevance to the administration of the M/WBE program, as will be discussed below.  For purposes of the motion for summary judgment, this memorandum will generally refer to the MBE program.

The City has administered a program to assist MBEs since 1997.    SUMF ¶1.  In addition, there is a parallel federal program to assist DBEs.  In 2011, the City business development agency, the St. Louis Development Corporation ("SLDC") adopted formal rules to govern the M/WBE program.  The SLDC designated the City's Airport Disadvantaged Business Enterprise Program Office, now known as City of St. Louis- Lambert International Airport Business Diversity Development Office ("BDD") to administer the ME program, thereby consolidating administration of the M/WBE program with the DBE program operated through the Airport under federal Department of Transportation.  SUMF ¶¶10-11.

Plaintiffs' initial MBE certifications were based on an assumption that the State of Missouri had recognized the Northern Cherokee Nation as an Indian tribe.  SUMF Ex. A, pp. 40-41.  However, the rules for the City's M/WBE program as adopted in 2011 provided, with regard

to claimed Native American status, that persons claiming such status were subject to the
following standard:

> Maintain cultural identification through tribal affiliation or community
> recognition with any of the original peoples of the North American
> continent and who demonstrate at least one-quarter descent from such
> groups ("Native Americans") as evidenced by a tribal enrollment card
> recognized by the Federal Bureau of Indian Affairs.  [SUMF Ex. 2, p. 5, ¶31.d.]

Although this standard differs from federal regulations in that it makes no reference to
state-recognized tribes, there is no procedure whereby the state of Missouri recognizes tribes.
SUMF ¶¶41-43.  In any event, none of the plaintiffs can meet the standard of this definition.

After press inquiries about the status of businesses claiming MBE status due to owner
affiliation with the Northern Cherokee Nation, the Airport Disadvantaged Business Enterprise
Program Office reviewed plaintiffs' status early in 2019.  See Amended Complaint [ECF 3] at
¶75; SUMF Ex. A (Gooding depo.) at pp. 45-46.  The Program Office concluded that, although
certified as MBEs, plaintiffs were not actually members of a federally recognized tribe, as
required by the certification and compliance rules of the MBE program.  As this process was
unfolding, the BDD also received at least one communication from the Department of
Transportation directing the City to ensure that its DBE program was in compliance with federal
regulations concerning the standard for according DBE status to persons claiming Indian or
Native American status, SUMF Ex. A, p. 64; SUMF Ex. H (Def.Depo.Ex. 1).  Based on this
directive from the federal government, the BDD requested that the Missouri Regional
Certification Committee ("MRCC")--composed of the Missouri federal DBE certification
partners and recognized by the U.S. Department of Transportation--reconsider plaintiffs' status as

DBEs in light of the federal regulations governing the determination of status as Native American or Indian-owned enterprises.  SUMF ¶¶42-43.

As a result of Plaintiffs failure to meet the certification requirements, in early 2019, the City's Airport BDD Program Office, recommended the decertification of Plaintiffs' MBE status because they could not  demonstrate that they were members of a federally recognized tribe. SUMF ¶29. That decision was approved by the Program Review Committee ("PRC") at the Airport.  SUMF ¶34.  Plaintiffs sought further administrative review, but the PRC decision was upheld on administrative review.  SUMF ¶36.  This lawsuit follows.

Defendant City is entitled to summary judgment for the following reasons: *first*, the application of federal criteria for determining Native American status is not a classification based on race, treating Native Americans differently than other cognizable racial or ethnic groups, but rather a classification based on status within a quasi-political entity (a tribe); *second*, the local M/WBE rules are consistent with the U.S. Department of Transportation's Disadvantaged Business Enterprises regulations, which are unquestionably constitutional; *third*,  the City's adoption of the federal criteria for determination of Native American tribal status is a rational means of distinguishing among applicants for MBE certification on the basis of status as Native Americans; and, *fourth,* plaintiffs have failed to show the requisite irreparable harm that is the essential predicate for injunctive relief, given the pending approval of rules for the City's M/WBE program that allow applicants individually to demonstrate social or economic disadvantage on the basis of their claimed racial or other status as a member of a protected group, without regard to definitions.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, answers to interrogatories,

4

depositions, and admissions, along with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether the moving party is entitled to summary judgment, the court must resolve all controversies in favor of the non-moving party and draw all justifiable inferences in favor of that party. *Miners v. Cargill Commc'ns, Inc.*, 113 F.3d 820, 823 (8th Cir. 1997). However, the non-moving party bears the burden to show, by affidavit or by "deposition, answers to interrogatories, and admissions on file," that there is genuine issue of fact to be resolved at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Evidence of a disputed factual issue which is merely colorable or not significantly probative will not prevent entry of summary judgment. *Anderson*, 477 U.S. at 248. To meet its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Plaintiffs must make a showing sufficient to establish the existence of each element essential to their claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

### I.   THE APPLICATION OF FEDERAL CRITERIA FOR DETERMINING NATIVE AMERICAN STATUS IS NOT A CLASSIFICATION BASED ON RACE.

At the outset, it is clear that there is no dispute of material fact as to plaintiffs' Title VI and Equal Protection claims.  Plaintiffs are not members of a federally recognized Indian tribe. Whatever the Northern Cherokee Nation may be (and defendant City does not concede that any

such Indian tribe or nation actually exists), it is not federally recognized.  The City decertified plaintiffs as MBEs on that basis alone.

It is also worth observing that the City is not obligated to create or administer any program designed to assist businesses on the basis of the race, sex, national origin, or other characteristics of the owners of the businesses.  It has chosen to do so, but under the Constitution, the City must ensure that the program is geared to addressing demonstrable past wrongs, cf. *Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989).  The City's rules will soon explicitly provide that membership in certain protected groups raises a presumption of social or economic disadvantage, but will allow for an applicant to demonstrate social or economic disadvantage even if the presumption is not raised.   SUMF ¶¶44, 47.  Thus, if plaintiffs can demonstrate that their Northern Cherokee affiliation has resulted in social or economic disadvantage to their businesses, they will still be eligible for certification as MBEs.

Native Americans maintain a unique legal status under federal law. *Morton v. Mancari*, 417 U.S. 535, 551 (1974). As a result, the relationship between the Equal Protection Clause of the Fourteenth Amendment, incorporated substantially in the Due Process Clause of the Fifth Amendment, see *Bolling v. Sharpe,* 347 U.S. 497 (1954), and legislative classifications involving Native Americans is far from clear.  Despite this uncertainty, the weight of authority holds that such classifications generally are not race-based classifications, but are classifications springing from the political history of Native American tribes as entities.  See *Morton v. Mancari,* 417 U.S. 535 (1974); see also *United States v. Antelope,* 430 U.S. 641 (1970); *Fisher v. District Court,* 424 U.S. 382 (1977).

According to the Supreme Court, Indians are not a racial group at all. *Morton v. Mancari,* 417 U.S. 535, 553 (1974). It is the fundamental conclusion of the Supreme Court that the

6

category "Indian", and all tribal subcategories, are not, for the purposes of Fourteenth

Amendment analysis, a racial category. Rather, uniquely, "Indian"--when analyzing laws dealing

with discrimination on their behalf, or even against them--refers only to a political group. *Morton

v. Mancari*, 417 U.S. 553 n. 24.  Federal regulation of Indian tribes and Indian affairs  is rooted

in the unique status of Indians as "a separate people" with their own political institutions, and is

not to be viewed as legislation of a "'racial' group consisting of 'Indians'…." *United States v.

Antelope*, 430 U.S. 641, 645-47 (1977) (citing Morton v. Mancari).

The Eighth Circuit, citing its decision in *United States v. Aanerud*, 893 F.2d 956, 960 (8th

Cir. 1990), noted that legislation, regulations, or informal policies that distinguish between or

among persons on the basis of membership in recognized Indian tribes do not amount to

discrimination on the basis of race. *United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir.

1999). Therefore, the longstanding principle that special treatment for Indians based on our

government's historic trust obligations is not race discrimination "fully answers the equal

protection arguments asserted by appellants." *United States v. Eagleboy*, 200 F.3d 1137, 1140

(8th Cir. 1999) (citing *United States v. Aanerud*, 893 F.2d 956, 960 (8th Cir. 1990)).

Consequently, the provision of special programs for Indians "has repeatedly been upheld by this

Court against claims of unlawful racial discrimination." *United States v. Eagleboy*, 200 F.3d

1139-40 (quoting *United States v. Antelope*, 430 U.S. 641, 646 (1977)).

Historically, the special benefits extended to Native Americans have been well protected.

The host of federal statutes and service programs designed to benefit Indians are rife with status-

based classifications used to designate the special position of a formerly sovereign people.

*United States v. Bruce,* 394 F.3d 1215, 1222 (9th Cir. 2005). These statues and programs require

proof of Native American affiliation or membership to receive their benefits. Such federal acts

include, to name a few, the Indian Civil Rights Act, 25 U.S.C. § 1301; the Indian Health Care

Improvement Act, *id.* § 1601; the Indian Education Act, *id.* § 2601; the Indian Alcohol

Substance Abuse Act, *id*. § 2403(3); and the Indian Child Welfare Act, *id.* § 1901. *See Morton v.*

*Mancari*, 417 U.S. 535, 552, 41 L. Ed. 2d 290, 94 S. Ct. 2474 (1974) ("Literally every piece of

legislation dealing with Indian tribes and reservations . . . singles out for special treatment a

constituency of tribal Indians living on or near reservations."). *United States v. Bruce*, 394 F.3d

1215, 1222 (9th Cir. 2005).  Indeed, state criminal laws that exempt selected Indians from their

application, based on membership in a specific tribal church, have been upheld against Equal

Protection assault.  See *Peyote Way Church of God , Inc. v. Thornburgh,* 922 F.2d 1210 (5th Cir.

1991).

It may be argued that federal legislative or regulatory distinctions among persons

claiming Indian heritage are subject to a different analysis for purposes of the Equal Protection

Clause, and that states and local governments do not enjoy the same flexibility as the federal

government in making such distinctions.  See, e.g., *St. Paul Intertribal Housing Bd. v. Reynolds,*

564 F. Supp. 1408 (D.Minn. 1983)(discussing the federal-Indian "trust" relationship as it relates

to special treatment accorded Indians).  However, such an argument in this case would be

misdirected.  The issue raised by plaintiffs is not properly characterized as discrimination

between plaintiffs and other racial groups, cf. *Rice v Cayetano,* 528 U.S 45 (2000); rather, it is a

distinction (or discrimination, if you will) among members of the same racial group, i.e., Native

Americans, based on a strictly neutral criterion:  membership in a federally-recognized tribe.

Because a distinction based on tribal membership is not a distinction based on race, it follows

that the City's choice to adopt the federal definition of Native American or Indian status for its

own purposes is not a classification based on race.  Thus, the City's classification is warranted if it is supported by a rational basis only.  E.g., *Lyng v. Castillo,* 477 U.S. 635 (1986).

The City's choice to treat plaintiffs differently from other Indians who are members of a federally-recognized tribe does not treat similarly situated persons differently on an arbitrary basis.  The rational basis for the City's choice to limit participation in its M/WBE program to businesses owned by members of recognized Indian tribes is twofold:  it furthers administrative convenience, as it precludes controversies exactly like the one here raised, enabling the City to identify persons claiming Native American status without extensive factual inquiry; in addition, it ensures that the City's MBE standards are congruent with the (federal) standards governing its DBE program, which fosters essentially the same goals of assisting socially or economically disadvantaged business enterprises.

It may also be observed that adherence to a regime recognizing Native American status on the basis of federal tribal recognition is consistent with the "trust" rationale enunciated in *Morton v. Mancari* and kindred cases.  By insisting on recognized tribal membership to benefit from its MBE program, defendant City avoids any action undermining Indian self-government and the authority of tribes to identify persons as truly Native American.  It should require more than Wikipedia blather to establish Native American heritage, particularly when persons of that heritage are the object of governmental beneficence.

In sum, neither Title VI[2] nor the Equal Protection Clause is implicated by the City's decision to adopt its rule regarding determination of Native American status or to deny MBE

---

[2] The failure of the Equal Protection claim necessarily compels rejection of the Title VI claim. Cf. *Gratz v. Bollinger,* 539 U.S. 244, 276, n. 23 (2003).

certification to plaintiffs in this case.  Summary judgment can and should be entered in favor of the defendant City on all claims alleged in the amended complaint.

## II.      THE LOCAL M/WBE RULES ARE CONSISTENT WITH THE U.S. DEPARTMENT OF TRANSPORTATION'S REGULATIONS PERTAINING TO DISADVANTAGED BUSINESS ENTERPRISES

The United States Department of Transportations Disadvantaged Business Enterprise program is governed by 49 C.F.R. part 26. The federal DBE program defines socially disadvantaged to include Native Americans and "includes persons who are enrolled members of a federally or State recognized Indian tribe..." 49 CFR § 26.5. 2. iii. The regulation further provides that

> Indian tribe means any Indian tribe, band, nation, or other organized group or community of Indians…which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians, or is recognized as such by the State in which the tribe, band, nation, group or community resides.

*Id.*

Here, the local MBE rules are consistent with the rules of the federal DBE program. Compare SUMF Ex. A, p. 64; compare SUMF Ex. B with 49 C.F.R. §26.5. At least since 2011, defendant City has administered its MBE program under the same scope, definitions, and procedure as the federal DBE program.  *Id.*. Both require that the members claiming minority status as a Native American/Indian, be members of a federally recognized Indian tribe.  *Id.*  The local M/WBE rules differ only in that they do not regard membership in a state recognized tribe as sufficient for certification. SUMF Ex. 2. Plaintiffs as members of the Northern Cherokee

Nation are not members of a federally recognized tribe.  SUMF ¶¶30, 46.  Further, Plaintiffs make no attempt to claim that their tribe has or ever had federal recognition.

At best, Plaintiffs attempt to rely on Northern Cherokee Nation's faux recognition by the State of Missouri in a Proclamation signed by former Governor Bond and a non-binding Missouri House resolution.  Amended Complaint [ECF 3] ¶¶52-53.  Pursuant to Missouri law, proclamations have no legal effect.  *Kinder v. Holden,* 92 S.W. 3d 793, 806 (Mo. App. W.D. 2002).   Regardless of the Proclamation, state tribal recognition is not enough to meet the qualifications for certification under the local MBE rules. SUMF Ex. B.

In fact,  the State of Missouri does not have a formal process by which to recognize Indian tribes. SUMF ¶41. This was confirmed in February 2020, when the Missouri Regional Certification Committee ("MRCC")--composed of the Missouri federal DBE certification partners and recognized by the U.S. Department of Transportation--unanimously voted that the State of Missouri does not have a tribal recognition process. SUMF ¶42. The MRCC then held a subsequent vote, to confirm that several "tribes" in Missouri, including the Northern Cherokee Nation, were not recognized by the State of Missouri because Missouri has no recognition process.  SUMF ¶43.  Although other certifying bodies relied on the Proclamation as proof of recognition in the past, thus causing the certification of Plaintiffs as MBEs before 2011, the Northern Cherokee Nation is not recognized by Missouri or the federal government as a tribe. Moreover, as of March 2020, the National Conference of State Legislatures website identifies no Native American tribes recognized by the State of Missouri and reveals the Northern Cherokee

Nation is not listed as recognized by any state[3]. But even if it was, it is clear that under the local rules state recognition is not enough--and, as demonstrated above, the local rules are lawful.

Because the City's MBE standards regarding certification of businesses owned by Native Americans are consistent with federal standards governing a parallel program, plaintiffs' theories of illegal discrimination cannot be accepted without calling into question the validity of the federal regulations after which the City's rules are patterned.  If the federal regulations are constitutional (and they are), it follows that the City's rules are likewise constitutional.  Cf. *Peyote Way Church of God , Inc. v. Thornburgh,* 922 F.2d 1210 (5th Cir. 1991).

## III.    PLAINTIFFS ARE NOT MEMBERS OF A FEDERALLY RECOGNIZED NATIVE AMERICAN (INDIAN) TRIBE AND THEREFORE FAIL TO MEET THE REQUIREMENTS FOR CERTIFICATION UNDER THE CERTIFICATION AND COMPLIANCE RULES FOR THE LOCAL MINORITY AND WOMEN OWNED BUSINESS ENTERPRISES PROGRAM

To be a federally recognized Indian tribe, a tribe must be recognized by the U. S. Department of the Interior, Bureau of Indian Affairs, ("BIA").   The BIA is the agency established and charged with the responsibility to recognize Native American tribes and our courts defer to the BIA's judgment on the issue of federal recognition. *Samish Indian Nation v. United States,* 419 F.3d 1355, 1370 (Fed. Cir. 2005); *Wyandot Nation of Kansas v. United States*, 858 F.3d 1392, 1402 (Fed. Cir. 2017).  The BIA has the authority to determine which tribes satisfy the criteria for federal recognition. *United States v. Zepeda*, 792 F.3d 1103, 1114 (9th Cir. 2015). It

---

[3] See:  http://www.ncsl.org/research/state-tribal-institute/ list-of-federal-and-state-recognized-tribes.

maintains and publishes annually a list of federally recognized tribes. *See, e.g.*, Indian Entities

Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs

("BIA List"), 75 Fed. Reg. 60,810-01 (Oct. 1, 2010); see also *Zepeda*, 792 F.3d at 1114. The

most recent listing by BIA lists 573 Indian entities recognized by and eligible to receive services

from the BIA; the Northern Cherokee Nation is not listed. *Federal Register, Vol. 84, No. 22,*

*Friday, February 1, 2019.*

The Federally Recognized Indian Tribe List Act of 1994 states that Indian tribes may be

recognized by: (1) an "Act of Congress;" (2) "the administrative procedures set forth in part 83 of

the Code of Federal Regulations[;]" or (3) "a decision of a United States court." *Cherokee Nation*

*of Oklahoma v. Norton,* 389 F.3d 1074, 1076 (10th Cir. 2004) (citing Pub. L. No. 103-454, §

103(3), 108 Stat. 4791; *see also United Tribe of Shawnee Indians v. United States,* 253 F.3d 543,

547-48 (10th Cir. 2001).

Here, Plaintiffs claim to be  members of the Northern Cherokee Nation. SUMF ¶¶13, 16,

19, 22.  The recognition of Indian tribes is within the purview of the federal government and the

Bureau of Indian Affairs.   See Federally Recognized Indian Tribe List Act of 1994, 108 Stat.

4791.  Absent such recognition, Indian tribes and their members do not receive special treatment

under federal law or federal programs. As stated above, the local MBE rules are closely modeled

after the federal DBE program. The local rules provide in relevant part that entities seeking

certification as Native American minorities must "[m]aintain cultural identification through tribal

affiliation or community recognition with any of the peoples of the North American continent

and who demonstrate at least one-quarter descent from such groups ("Native Americans") as

evidenced by a tribal enrollment card recognized by the Federal Bureau of Indian Affairs."

SUMF, Ex. B at ¶31.d. Plaintiffs have failed to demonstrate that Northern Cherokee Nation is

13

federally recognized.  Plaintiffs' inability to claim minority status in a federally recognized tribe resulted in their decertification.  Their decertification conforms to the City's rules and governing federal law, suffers from no constitutional deficiency, and this Court has no basis to intervene in the matter via this action.

**IV.    PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF IS NOT COGNIZABLE AT THIS TIME, AS THE RECORD DOES NOT DEMONSTRATE ANY LIKELIHOOD OF IRREPARABLE HARM, PARTICULARLY IN LIGHT OF THE IMPEDING CITY RULE CHANGES THAT WILL ENABLE PLAINTIFFS TO PURSUE CERTIFICATION WITHOUT REGARD TO MEMBERSHIP IN A FEDERALLY RECOGNIZED TRIBE.**

It is elementary that a plaintiff is not entitled to injunctive relief absent a showing of irreparable harm.  E.g., *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139 (2010).  In the case at bar, plaintiffs can make no showing of future irreparable harm warranting injunctive relief. The City is on the verge of adopting new M/WBE rules that will afford plaintiffs the opportunity to obtain MBE certification without showing membership in a federally recognized tribe.  If plaintiffs can establish social or economic disadvantage based on their Northern Cherokee heritage, they will be able to obtain certification without intervention by this Court.

Injunctive relief is extraordinary relief.  *Winter v. NRDC, Inc.,* 555 U.S. 7 (2008). Further, plaintiffs' invitation to this Court to intervene in the City's M/WBE certification process implicates basic principles of comity and federalism.  Cf. *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983).  The City is attempting to administer its M/WBE program in an equitable manner without invidious discrimination.  In light of the advent of the City's new rules for its program, plaintiffs' claim for injunctive relief should be dismissed.

14

**CONCLUSION**

For the foregoing reasons, defendant City's motion for summary judgment should be granted, and judgment entered in favor of defendant City, dismissing the amended complaint with prejudice, at plaintiffs' cost.  In the alternative, plaintiffs' claims for declaratory and injunctive relief should be dismissed.

<div style="margin-left:auto">

Respectfully submitted,
JULIAN L. BUSH, CITY COUNSELOR
/s/Robert H. Dierker 23671(MO)
Deputy City Counselor
dierkerr@stlouis-mo.gov
Chelsea Mannery 71062(MO)
Assistant City Counselor
manneryc@stlouis-mo.gov
314 City Hall
1200 Market St.
St. Louis, MO 63103
314-622-3361
Attorneys for Defendants

</div>