FINAL 8-12-20

**CITY OF ST. LOUIS**
**MINORITY AND WOMEN'S BUSINESS ENTERPRISE PROGRAM**

**CERTIFICATION AND COMPLIANCE RULES**

**ISSUED BY THE CITY OF ST. LOUIS M/W/DBE PROGRAM OFFICE**

**AND APPROVED BY THE**

**ST. LOUIS DEVELOPMENT CORPORATION**

**OCTOBER 2020**

Exhibit A

**CITY OF ST. LOUIS**
**MINORITY AND WOMEN'S BUSINESS ENTERPRISE PROGRAM**

**CERTIFICATION AND COMPLIANCE RULES**

**TABLE OF CONTENTS**

PART I:  PURPOSES, DEFINITIONS, AND GENERAL REQUIREMENTS ............................ 1

Policy Statement

  A.  Goals of the Program.................................................................................1

  B.  Objectives of These Rules. ........................................................................1

  C.  Definitions.................................................................................................1

Roles and Responsibilities

  D.  Implementation. ........................................................................................7

  E. Severability. ..............................................................................................7

  F.  Disclaimers. ..............................................................................................7

  G.  Failure to Provide Information....................................................................7

  H. Compliance with Other Laws......................................................................8

  I.  M/WBE Directory .....................................................................................8

  J. Computation of Time……………………………………………………8

PART II:  COMPLIANCE ................................................................................ 8

  A. Objectives................................................................................................8

  B. M/WBE Participation Goals and Requirements............................................8

Table or Chart with Goals            9
C. Professional Services..................................................................................9

  D. Supply Contracts. ......................................................................................10

  E. Service and Concession Contracts................................................................10

  F. Public Works Contracts (Construction and Professional Services) ....................10

  G. Public Works Contracts - Good Faith Efforts Review ..........................12

  H. Public Works Contracts - Counting M/WBE Participation ....................15

  I.  Performance of a Commerically Useful Function - Public Works Contracts..........16

  J.  Redevelopment Projects (Construction and Professional Services)......................17

  K. Joint Ventures ...........................................................................................23

i

L. Performance of Commercially Useful Function ................................................ 25

M. Reporting Requirements. ............................................................................... 26

N. Compliance Review During Contract Performance ...................................... 27

O. Contractor/Subcontractor Maintenance of Records; Review after Contract
Completion; Patterns of Willful Non-Compliance or Misrepresentation…………28

P. Payment to M/WBE and other Contractors and Subcontractors........................ 29

Q. Remedies…………………………………………………………………………………29


PART III:  CERTIFICATION........................................................................... 30

A. Objectives........................................................................................... 30

B. Burden of Proof. ................................................................................. 30

C. Rebuttable Presumption of Social and Economic Disadvantage. ........................... 30

D.  Ownership. ......................................................................................... 32

E.  Control. ............................................................................................... 36

F.  Additional Rules Affecting Certification. ............................................... 40

G.   Program Review Committee Proceedings. ......................................... 3

H. Willful Noncompliance in General - Penalties and Sanctions. ..................... 45

I. M/WBE Decertification .......................................................................... 45

J.  Appeals…………………………………………………………………………………47

Commented [ENE1]:

Commented [ENE2]:

ii

## EXHIBITS

Exhibit 1:    Abbreviated Application
Exhibit 2:    MRCC Member Agency M/WBE Release
Exhibit 3:    M/WBE Certification Approval Letter
Exhibit 4:    Request for Area of Expertise Review
Exhibit 5:    Standard Application
Exhibit 5A: Uniform Application
Exhibit 6:    M/WBE No Change Affidavit
Exhibit 7:    Five Year M/WBE Renewal Application
Exhibit 8:    Suggested Letter of Intent Form
Exhibit 9:    Utilization Plan
Exhibit 9A: Request for a Waiver
Exhibit 10:  Non-Construction Report Form
Exhibit 11:  Construction Report Form
Exhibit 12:  Close-out Report

## PART I:  PURPOSES, DEFINITIONS, AND GENERAL REQUIREMENTS

### A.  Goals of the Program.

The goals of the City of St. Louis Minority and Women's Business Enterprise Program (the "Program"), pursuant to Ordinance #70767 are the following:

The Minority and Women's Business Enterprise Program ("M/WBE") seeks to address historical social and economic disadvantage experienced by minority group members and women to reduce minority and gender based barriers to and foster participation by minority and women owned businesses in the City of St. Louis contract and procurement opportunities.  It is the Program's policy:
1.   To ensure nondiscrimination directed to minorities and women in the award of City contracts;
2.  To create a level playing field on which M/WBEs can compete for City of St. Louis funding and/or incentives ("City Contracting Opportunities");
3.  To ensure the M/WBE Program is narrowly tailored to achieve its goals in accordance with the applicable law;
4.  To ensure that firms certified under the Program meet the Program's eligibility standards;
5.  To help remove barriers to the participation of M/WBEs in City contracts;
6.  To assist in the development of firms that can compete successfully in the marketplace outside of the M/WBE Program.

### B.  Objectives of These Rules.

The objectives of these Rules are the following:  (a) to set forth eligibility standards for certification of business entities as MBEs and/or WBEs; (b) to set forth the process for determining when such eligibility standards have been met; (c) to set forth standards for compliance with MBE and WBE participation goals set forth in the Order; (d) to set forth standard processes for monitoring compliance with the Order; (e) to set forth standards for certification and compliance approvals, denials, penalties, and removal of eligibility; and (f) to set forth the administrative appeals process.

These Rules are intended to maximize the "user-friendliness" of the certification process while ensuring that only legitimate minority and women's business enterprises are certified as such, and to maximize the "user-friendliness" of the compliance monitoring process while ensuring that entities participating in City Contracting Opportunities fulfill their responsibilities pursuant to their representations and the Ordinance.

### C.  Definitions.

1

1. **Administrative Review Officer**:   A person whose duty is to adjudicate administrative appeals of decisions made by the Authority or Program Review Committee.

2. **Affiliation:**   Any person or firm ("concern") submitting an application for certification, application for renewal, or a No Change Affidavit to the Program Office for determination of eligibility as an M/WBE are affiliates of each other when, either directly or indirectly:

    a. one concern controls or has the power to control the other;

    b. a third party or parties controls or has the power to control both concerns;

    c. a separate concern controls or has the power to control the applicant concern's monetary decision-making; or

    d. an identity of interest exists between or among parties such that a reasonable person would conclude that affiliation exists.

3. **Airport Assistant Director Community Programs (Director):** The person charged with managing and operating the overall Certification Program.

4. **Applicant:**  The firm submitting a Standard Application for M/WBE certification or renewal or a No Change Affidavit with the City of St. Louis M/WBE Program (the "Program").

5. **Authority:**  The entity (St. Louis Lambert International Airport) selected by the St. Louis Development Corporation to manage the Certification Program and the Airport Compliance Program.

6. **Business Type:**  For the purposes of area of expertise assignment and counting, a prime contractor, subcontractor, consultant, supplier, manufacturer, service contractor, concession contractor, or joint venture.

7. **Certification**: A determination by the Program Review Committee (PRC) that a concern is a legitimate Minority and/or Women's Business Enterprise.  The PRC may make such determination either through the Standard Application process or via the Abbreviated Application process specified in these Rules.

8. **Certification Analyst:** A person, firm, and/or consultant designated by the Authority, who is responsible for conducting the M/WBE certification review process and making a preliminary recommendation to the Authority with respect to whether Certification is appropriate.

2

9. **Certification Approval Letter:** The written document evidencing Certification and the firm's area(s) of expertise.

10. **Certification Manager:** A person, designated by the Authority, who is responsible for a) managing the certification portion of the Program; b) reviewing the work and certification recommendations of the Certification Analysts; c) making M/WBE certification decisions in the Director's absence; and d) presenting recommendations concerning M/WBE certification to the Program Review Committee.

11. **City**:   Municipal Officials of the City of St. Louis.

12. **City Contracting Opportunity**: A "City Contracting Opportunity" exists for purposes of these Rules when an agency, department, division of the City or other entity covered by Ordinance 70767 intends to enter into a contract or agreement covered by the Mayor's Executive Order, pursuant to which the City pays a contractor to perform Work or pursuant to which the City provides incentives to a contractor to achieve particular public purposes.  For purposes of these rules, both types of contracts and contractors are referred to as "Contracts" and "Contractors".

13. **City Directory**:   The listing of certified M/WBE firms. The City Directory is located at www.flystl.com/bdd. Click on the tab "Find Certified Firms.

14. **Commercially Useful Function:** An M/WBE is considered to perform a commercially useful function when it is responsible for executing a distinct element of the Work and carries out its responsibilities by actually performing, managing, and supervising the work involved based on an evaluation of the amount of work subcontracted, industry practices, and other relevant factors, as further detailed herein.

15. **Compliance**: A determination by St. Louis Development Corporation("SLDC") or the Authority that a Utilization Plan for MBE and WBE participation in a particular contract is in compliance with these Rules and that the proposed contractor has otherwise complied with these Rules.

16. **Compliance Office**:   The City agency designated as responsible for implementing the compliance aspects of the Program.

17. **Compliance Officer:** A person, designated by SLDC or the Authority, who is responsible for managing the Compliance portion of the Program and approving an M/WBE Utilization Plan as being in Compliance.

18. **Construction Contract:**   An agreement for the performance of construction Work pursuant to architectural and/or engineering plans and/or specifications and/or scopes of work.

19. **Contract:**   An agreement executed by a Contractor and a City Contracting Agency for the performance of Work of any type.

20. **Contracting Agency:**  Any City agency or department posting, making, and/or managing a City Contracting Opportunity.

21. **Contractor:**  An entity executing or intending to execute the Contract with a City Contracting Agency.

22. **Deputy Director of Finance and Administration**:  The person overseeing the position of Airport Assistant Director Community Programs and the person with authority to act in the Director's absence.

23. **Decertification**: The removal of an M/WBE firm's certification.

24. **Disadvantaged Business Enterprise (DBE)**: A for-profit small business concern defined by 49 C.F.R. Part 26 for the purpose of projects where applicable U.S. Department of Transportation funds are expended.

25. **Diversity Office:** SLDC Office of Minority Business Development & Compliance or The Authority – Business Diversity Development.

26. **Goals:**   For construction, general services, and Board of Public Service the following are the minority and women owned business goals: 21% African American Owned Business Participation, 2% Hispanic Owned Business, 0.5% Asian-American Owned Business, 0.5% Native- American Owned Business and 11% Women-Owned Business Participation established by Ordinance #70767.

27. **Good Faith Efforts:**  Demonstrated efforts to achieve the Goals which by the type, scope, intensity, and appropriateness of the efforts can reasonably be expected to achieve the Goals to the maximum possible extent, as further detailed in Part III of these Rules.

28. **Immediate Family Member:**  Father, mother, husband, wife, domestic partner, son, daughter, brother, sister, grandmother, grandfather, grandson, granddaughter, mother-in-law, or father-in-law.

29. **Joint Venture:** A contractual relationship between an M/WBE firm and one or more other firms to carry out a single, for-profit business enterprise, for which the parties combine their property, capital, efforts, skills and knowledge, and in which the M/WBE is responsible for a distinct, clearly defined portion of the work of the contract and whose share in the capital contribution, control, management, risks and profits of the joint venture are commensurate with its ownership interest, as further detailed herein.

**30. Local Firm:** A business entity authorized to do business in the State of Missouri that maintains a facility within the St. Louis Metropolitan Statistical Area with adequate personnel, equipment, materials and facilities to perform its local work in the area(s) of expertise designated in the Utilization Plan.

**31. Mayor's Executive Order or "Order":** Mayor's Executive Order #59, Minority and Women Owned Business Participation on City Contracts, dated May 16, 2017 as has been or may be extended and/or amended from time to time.

**32. Minority Business Enterprise ("MBE"):** A for-profit sole proprietorship, partnership, limited liability company, or corporation owned, operated and controlled by Minority Group Members who (a) have at least 51% ownership of the business entity; (b) maintain day-to-day operational and managerial control of the business entity; and (c) have interest in capital and earnings commensurate with the Minority Group Member(s)' percentage of ownership.  For purposes of these Rules, the MBE firm must be a Local Firm, certified as an MBE by the Program Review Committee.

**33. M/WBE or M/WBEs:**   Collectively, one or more Minority Business Enterprise(s) and/or Women's Business Enterprise.

**34. Minority Group Members**: Persons who:

   a. Have origins in any of the Black racial groups of Africa ("Black or African Americans");

   b. Have origins in any of the Spanish or Portuguese-speaking peoples of Latin America, regardless of race ("Hispanic Americans");

   c. Have origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent or the Pacific Islands ("Asian Americans"); or

   d. Maintain cultural identification through tribal affiliation or community recognition with any of the original peoples of the North American continent ("Native Americans") and enrolled in a tribe recognized by the United States Bureau of Indian Affairs.

**35. Missouri Regional Certification Committee ("MRCC"):**  The five agencies in Missouri that receive direct U.S. Department of Transportation Funds and currently operate DBE programs pursuant to the U.S. Department of Transportation DBE program, including the Missouri Department of Transportation, Bi-State Development Agency of the Missouri-Illinois Metropolitan District (Metro), the City of St. Louis, the City of Kansas City, and the Kansas City Area Transit Authority.

5

36. **North American Industry Classification System (NAICS):** For the purpose of M/WBE certification, the six-digit numerical code assigned to identify the primary business activity the firm is certified to perform that can be counted toward MBE or WBE participation goals.

37. **The Order:** Executive Order 59, as amended, relating to Minority and Women-Owned Business Participation on City Contracts.

38. **Principal Local Place of Business:** The business location within the St. Louis MSA where the individuals who manage the firm's day-to-day operations spend most working hours and where management's business records with respect to local contracts are kept.

39. **Program Review Committee ("PRC"):** A committee formed by the St. Louis Development Corporation for the purpose of a) determining whether an application for M/WBE certification should be approved or denied; b) determining whether to approve the removal and decertification a firm's M/WBE eligibility .

40. **St. Louis Development Corporation ("SLDC"):** The Missouri not-for-profit corporation charged with overall responsibility for the administration and enforcement of Ordinance 70767

41. **St. Louis Metropolitan Statistical Area ("SLMSA"):** The area comprised of the City of St. Louis, the Missouri counties of St. Louis, Jefferson, Lincoln, St. Charles, Warren, Washington, and Franklin, and the entire City of Sullivan (including the portion located in Crawford County) and the Illinois counties of Bond, Calhoun, Clinton, Jersey, Macoupin, Madison, Monroe, and St. Clair.

42. **Utilization Plan:** The form detailing the goods and services provided to the prime contractor by each M/WBE listed to meet the M/WBE goals.

43. **Utilization Plan Acceptance Letter:** The written document evidencing that the Authority has approved a Utilization Plan for a City Contracting Opportunity.

44. **Women's Business Enterprise ("WBE"):** A for-profit sole proprietorship, partnership, limited liability company, or corporation owned, operated and controlled by one or more Women who (a) have at least 51% ownership of the business entity; (b) maintain day-to-day operational and managerial control of the business entity; and (c) have an interest in capital and earnings commensurate with Women's percentage of ownership.  For purposes of these Rules, the WBE firm must be a Local Firm, certified as a WBE by the Program Review Committee.

6

**45. Work:**  The performance of tasks, which tasks may include the provision of materials and/or supplies, or the variety of tasks involved in a development project, required to fulfill the objectives of a Contract.

**D.  Implementation.**

1.  These Rules were adopted by SLDC pursuant to Ordinance 70767.

2.   By Memorandum of Agreement between SLDC and the Airport Business Diversity Development Office ("BDD"), certain duties to implement these Rules with respect to the certification of firms under these Rules, are delegated to BDD as the Authority, and BDD is authorized and directed to perform such functions. All other functions not so delegated to BDD remain with SLDC as the Authority herein.

3.  These Rules shall be effective on October 1, 2020 as to all aspects of the Program.

**E.  Severability.**

All sections of these Rules shall be severable. In the event that any section of these Rules is found by a court of competent jurisdiction to be unconstitutional or unlawful, the remaining sections of these Rules shall be valid unless the court finds the valid sections of these Rules are so essentially and inseparably connected with and so dependent upon the void section that it cannot be presumed that  the valid sections could have been promulgated without the void one, or unless the court finds that the valid sections, standing alone, are incomplete and incapable of being executed in accordance with the intent of the Order.

**F.  Disclaimers.**

The City, SLDC, the Authority, and the Program disclaim any and all responsibility for the quality of work to be or previously performed by any M/WBE, and for any representations as to the quality, experience, capabilities or qualifications of any M/WBE.  Further, the City, SLDC, the Authority and the Program expressly do not promise, imply or otherwise represent that any M/WBE shall receive any contracts whatsoever based solely on Certification.

The City, SLDC, the Authority, and the Program reserve the rights to, from time to time, modify these Rules, the Application forms and any other forms referenced in these Rules.

**G.  Failure to Provide Information.**

All Applicants, M/WBEs and contractors shall provide information reasonably requested in accordance with this Rules in any applications made pursuant to these

7

Rules for certification, renewal, annual updates and/or compliance.  The Program shall, pursuant to and in accordance with these Rules, be entitled to withhold any approvals requested by any Applicant, M/WBE, as applicable, and/or contractor for failure to provide such information.  "Reasonably requested" shall mean requested within the time frames set forth in these Rules and requests for information required by these Rules.

**H.  Compliance with Other Laws.**

All City contractors, subcontractors, and M/WBEs, as applicable, must comply with all relevant federal, state, and local laws in addition to these Rules and the Order, including, but not limited to Missouri Immigration Law found at §285.525 R.S.Mo.

**I.  M/WBE Directory**

The Authority shall, at a minimum, maintain, make available to interested persons, and post on the Authority's Internet website a directory listing all MBEs and WBEs that the Authority deems to be certified.  Each listing shall include the certified entity's address, telephone number, contact person name, contact person's telephone number and e-mail address, website (if known), and the area(s) of expertise in which the firm has been certified to perform as an M/WBE.  The Program shall update the directory within two days following the MBE or WBE's Certification or re-Certification.  The Program shall update the directory within ten (2 days following a PRC decision to remove a firm's M/WBE eligibility.  M/WBE participation will be counted according to the M/WBE's NAICS codes listed in the M/WBE directory.

**J.  Computation of Time.**

Unless specified otherwise by these Rules, the first day of the designated period of time is not to be counted.  The last day of the period of time is to be counted, unless it is a Saturday, Sunday, or a legal holiday under the laws of the City of St. Louis.

**PART II:  COMPLIANCE**

**A.  Objectives.**

This Part describes the requirements of the Program, the City of St. Louis and contracting parties for compliance with Ordinance 70767 relating to Minority and Women's Business Participation in City Contracting Opportunities.

**B.  M/WBE Participation Goals and Requirements.**

The City's Goals for Minority and Women's Business Participation in City Contracting Opportunities are set forth in the Ordinance. Under no circumstances shall the Goals be construed as quotas or set asides.

Pursuant to the Ordinance, business entities involved in City Contracting Opportunities are required to meet the following goals for utilization of MBEs and WBEs in carrying out the Work.

| Construction Goals | |
|---|---|
| African American | 21% |
| Hispanic American | 2% |
| Asian American | 0.50% |
| Native American | 0.50% |
| Women-Owned | 11% |

| Bid Discount Program | |
|---|---|
| Construction - Prime Contracts <=$300k | 5% |
| African American | |
| Hispanic American | |
| Asian American | |
| Native American | |
| Women-Owned | |
| Services - Prime Contracts <=$300k | 5% |
| African American | |
| Asian American | |
| Hispanic American | |
| Native American | |
| Women-Owned | |

| Professional Services - Prime Contracts | 15% of total evaluated points |
|---|---|
| African American | |
| Asian American | |
| Native American | |
| Hispanic American | |
| Women-Owned | |

**C. Professional Services (Board of Public Service and Redevelopment Projects)**
The goals are 25% MBE and 5% WBE participation.

**D. Supply Contracts**: M/WBEs shall be utilized and counted in accordance with the City Charter.

**E. Service and Concession Contracts.**
For service and concession contracts, the guidelines below apply.

1. Utilization of certified M/WBEs shall be demonstrated by contract proposers in accordance with the **Ordinance**.

2. The proposer must ensure that all MBEs and WBEs projected for use have been certified by the City prior to bid opening.

3. The proposer must complete, sign and submit a Utilization Plan and supporting documents to the Contracting Agency for review and approval prior to execution of the contract, as required by the Contracting Agency's rules and procedures applicable to the contracting authority.  The following documents are due at the time of bid submission:
   - The Utilization Plan
   - Notice of Intent
   - Subcontractor List
   - Good Faith Efforts Report and Documentation
     A narrative if the goals are not met
4. No Contracting Agency shall commence the Contract execution process unless and until such Plan has been submitted to and approved by SLDC or the Authority.

**F. Public Works Contracts**

1. Bid preparation and submission shall be conducted in accordance with the Ordinance as follows:

   a. For any work to be subcontracted or materials to be supplied, prime contractors shall solicit bids from MBEs and WBEs to the maximum extent possible, referring to the City's Directory.

   b. All solicitations shall be made prior to the bid opening and there shall be no negotiation of bids or "bid shopping" by the contracting agency.  Contractors bidding on more than one contract must solicit bids from MBEs and WBEs for each contract for which they are bidding regardless of the proximity of the bid dates or the previous lack of responsiveness of MBEs and WBEs.

   Only firms that have been certified as MBEs or WBEs by the City of St. Louis prior to the bid opening will be counted as such.

10

2. **Bid Submission Requirements.** The applicable Diversity Office will review submitted M/WBE documents including the Utilization Plan. The bidder shall include with its bid a definitive statement of the minimum percentage of MBE participation and the minimum percentage of WBE participation the bidder commits to achieving in the subcontracting and performance of the Work, on the bid forms prescribed by the Contracting Agency.  Contractors are encouraged to meet with the Compliance Office to discuss the appropriate MBE and WBE participation prior to the submission of the bids.   Bidders must submit the following items:

- The Utilization Plan
- Notice of Intent
- Subcontractor List
- Good Faith Efforts Report and Documentation
- A narrative if the goals are not met (at the completion of the project)

3. **Bid Review.** The applicable Diversity Office will review all submitted bid documents including the Utilization Plan.

4. **Utilization Plan Review.**

a. Following bid opening, copies of the bid documents will be distributed to the applicable Diversity Office.  The applicable Diversity Office will immediately begin a review of the bid documents and, within ten (10) business days following the bid opening, will make a recommendation as to the apparent low bidder's good faith efforts to meet the city's goals.

b. In reviewing the Utilization Plan and preparing its review documentation, the applicable Diversity Office may include but is not limited to the following:

i. Contact MBEs and WBEs to verify that the apparent low bidder solicited bids from each of them, that the MBE and WBE subcontractor bid amounts listed accurately reflect the amounts actually quoted by those firms and, in the case of those MBE/WBE firms proposed to be utilized by the low bidder, that the apparent low bidder has tentative agreements with them in the amounts shown;  the Diversity Office may also request bid submittals from MBE/WBE firms proposed to be utilized by the apparent low bidder;

ii. For work being subcontracted to non-MBE/WBE firms, the applicable Diversity Office will contact the certified MBE and WBE firms in that particular trade, service or supply area to verify that, after solicitation of bids by the proposed prime contractor, the MBE and WBE firms submitted high or non-responsive bids or no bids at all;

11

   iii. Contact M/WBEs and subcontractors to verify and/or obtain clarification of the information provided in the Notice of Intent and confirm that each M/WBE will perform a Commercially Useful Function in the performance of the work;

   iv. Seek additional information from the Contractor and/or seek information from the M/WBEs included in the Utilization Plan.  If additional information is requested, the Contractor shall have three (3) business days to provide a response.  If no response is received within three (3) business days, the applicable Diversity Office shall recommend denial of the contract award to the Contracting Agency.

 **c**. **Determination as to Utilization Plan Acceptability.**  Within ten (10) business days following bid opening, the applicable Diversity Office shall make a recommendation as to the acceptability of the Utilization Plan and communicate that decision to the City Contracting Agency, using the following procedures and criteria:

i. Based on the information provided and the information obtained from contacts with M/WBEs and subcontractors, the applicable Diversity Office may adjust the participation amounts included in the Utilization Plan in accordance with the counting provisions of Ordinance 70767.

ii. If the Utilization Plan, as adjusted, demonstrates that the Contractor will meet or exceed the Goals, the applicable Diversity Office shall make a positive recommendation to the contracting agency for contract award to the low bidder.

iv. If the Utilization Plan, as adjusted, does not demonstrate that the Contractor will meet the goals but the Contractor has demonstrated a good faith effort including provision of documentation of efforts and a written narrative outlining reasons for failure to achieve the goal, the applicable Diversity Office shall make a positive recommendation to the contracting agency for contract award to the low bidder.

 **d.** **Approved Utilization Plan.**  The applicable Diversity Office's participation approval letter and participation worksheet shall be attached to the contract.

 **e. Post-Submission Requirements.** Within three (3) business days of contract execution, the contractor must provide the contracting agency and the applicable Diversity Office with fully executed copies of contracts with all subcontractors.

**G. Public Works Contracts - Good Faith Effort Review**

If the Utilization Plan does not demonstrate achievement of the M/WBE Goals, the applicable Diversity Office shall review the efforts made by the Contractor to achieve the Goals to determine if the Contractor did in fact make a good faith effort prior to bid opening and forward its recommendation to the Contracting Agency.   The applicable Diversity Office shall use the following guidelines in conducting such review.

1. The Contractor shall have taken all necessary and reasonable steps, with such steps having the necessary scope, intensity, and appropriateness, to achieve the M/WBE Goals.  Such steps must include personal, frequent and persistent contact with individual M/WBEs and personal contact with the applicable Diversity Office to identify prospective M/WBEs for the work.   The distribution of solicitations and/or the placement of plans and bid solicitations in plan rooms or other sources of work frequented by M/WBEs shall not alone be sufficient to demonstrate good faith efforts without such personal, frequent and persistent outreach.

2. The following is a non-mandatory, non-exhaustive, non-exclusive list of types of actions that, together with the personal, frequent and persistent contact described above, the applicable Diversity Office may consider as evidence of good faith efforts to obtain M/WBE participation.  Other factors or types of efforts may be relevant depending on the nature of the contract and the types of work involved.

    a. Soliciting through all reasonable and available means (e.g. attendance at pre-bid meetings, advertising and/or written notices) the interest of all certified M/WBEs who have the capability to perform the work required by the Contract.  Such solicitations must take place at least fifteen (15) business days prior to the bid opening date to allow M/WBEs sufficient time to prepare bids/proposals and respond to the solicitation, and the Contractor must take appropriate steps to follow such mass solicitations with personal frequent and persistent contact.  The prime contractor should promptly return all calls, faxes and e-mail that it receives from interested M/WBEs.  The follow-up should take the form of a telephone call, fax or e-mail during normal business hours.

    b. Breaking subcontracts down into discrete items or packages that at least some of the M/WBEs in the relevant area may find economically feasible to perform.  The prime contract bidder should not deny a subcontract to an otherwise qualified and competitive M/WBE solely because the latter cannot perform an entire package of related items, but the bidder may deny a request to repackage the work where doing so would jeopardize scheduling, or increase that bidder's cost of performing the original package by an excessive amount.

c.  Efforts made to select portions of the work proposed to be performed by M/WBEs in order to increase the likelihood of achieving the goals, including, where appropriate, but not limited to, breaking down contracts into economically feasible units to facilitate M/WBE participation.  Selection of portions of work are required to at least equal the goal for M/WBE utilization specified in the contract.

d.  Providing M/WBEs with technical assistance and adequate information about the plans, specifications, and requirements of the contract in a timely manner to assist them in responding to a solicitation.  Upon request, the plan holder should permit any interested M/WBE to review the project's plans and specifications at the plan holder's place of business during normal business hours. In addition, the prime contract bidder should have a least one employee available to help the M/WBE identify the specific item(s) in which the latter may have an interest.

e.  Negotiating fairly with interested M/WBEs, even when selecting an M/WBE contractor or subcontractor may increase the cost of the work; however, where two or more quotes cover the same item(s) of work, the prime contractor bidder should have the discretion to accept the low quote.

f.  Fairly and thoroughly evaluating the capabilities of particular M/WBEs before accepting or rejecting their bids or proposals.  An M/WBE's standing within its industry, membership in specific groups, organizations, and associations and political or social affiliations are not legitimate causes for the rejection or non-solicitation of bids in the Contractor's efforts to meet the Goals.

g.  Not denying a subcontract to an otherwise qualified and competitive, and if necessary, certified M/WBE solely because the latter cannot provide a performance or payment bond for the work, unless the bidder's bonding is contingent upon bonding for all subcontractors.

   i.  Making efforts to assist interested M/WBEs in obtaining bonding, lines of credit, or insurance as required by the bid or contract documents.

h.  Effectively using the services of the applicable Diversity Office to provide assistance in the recruitment and placement of M/WBEs.

i.  Assigning a senior official the responsibility of serving as a liaison between the firm and the M/WBES in the relevant area (independent and apart from its interest in any one project).

j.
   The applicable Diversity Office may consider the percentages of minority and women participation submitted by other bidders in conjunction with their bids in determining whether a Contractor has made good faith efforts.  For example, when the apparent low bidder fails to meet the Goals but other

14

bidders have met the Goals, the applicable Diversity Office may consider whether, with additional reasonable efforts, the apparent low bidder could have met the goal.  Conversely, if the apparent low bidder fails to meet the Goals but equals or exceeds the participation levels specified in the second-lowest bid or the average M/WBE participation levels specified in the other bids, the applicable Diversity Office may view this, in conjunction with other factors, as evidence of the apparent low bidder's good faith efforts.

3.  The ability or desire of a contractor or general contractor, consultant, supplier, or other entity working with the Contractor to perform the work of a contract with its own forces rather than via a subcontract does not relieve the bidder of the responsibility to make good faith efforts to fully achieve the Goals.

**H.  Public Works Contracts - Counting M/WBE Participation.**

**1.  Certification Required.**  Only the participation of certified MBEs and WBEs prior to the bid opening shall be credited towards the Goals.  An entity must be certified as an MBE and/or WBE in the specific area of the North American Industry Classification System (NAICS) code before the firm's work in that particular area may be credited towards the Goals.

**2.  Performance of a Commercially Useful Function Required Through the Contract Duration.**  A certified M/WBE must perform a Commercially Useful Function, as determined by the applicable Diversity Office in accordance with the provisions below, in order for such firm's work to be credited towards the Goals. To determine whether an MBE or WBE is performing a commercially useful function, the Diversity Office will evaluate the amount of work subcontracted, industry practices, and other relevant factors listed below.  For instance, payment to the M/WBE under the contract must be commensurate with the work the M/WBE is actually performing and the M/WBE credit claimed for the performance of the work.  The participation of M/WBEs that do not perform a Commercially Useful Function shall not be counted.

**3.  Authority Approval Required for Changes.**

a.  Whenever additional contract supplements, extra work orders, or change orders are made that individually, or in the aggregate, increase the total dollar value of the original contract, the contractor must maintain the level of MBE and WBE participation as established in the original contract.  If the Contractor is unable to meet its M/WBE contractual commitment, it must submit documentation of reasons for failure to meet the goals and must be approved by the applicable Diversity Office.

b.  **Substitutions**: No Contractor shall change any subcontractor list unless a Substitution Form is submitted in writing to and approved in writing by the applicable Diversity Office.  The applicable Diversity Office shall approve an

15

amendment to the Utilization Plan within five (5) business days from submission of the request for an amendment in the following circumstances:

    i.    The certified MBE or WBE is not performing at an acceptable level, and/ or is no longer available or willing to perform the work with approved documentation; and

        A)    The Contractor is proposing to replace the M/WBE included in the original Utilization Plan with another M/WBE whose subcontract will be in an amount equal to or greater than the originally included M/WBE and such replacement is otherwise equal (e.g., the Contractor proposes to replace an MBE with an MBE and a WBE with a WBE with the same Certifications); or

        B)    The Contractor demonstrates to the satisfaction of the Compliance Office that such replacement is not possible because (a) there is no comparable MBE or WBE available to perform the work, or (b) the performance of the overall contract work has progressed to the stage where the insertion of a new MBE or WBE subcontractor would unacceptably delay completion of the ork.

**I.  Performance of a Commercially Useful Function – Public Works Contracts**

  **1.  Commercially Useful Function Required.**  The Compliance Office shall, using the following criteria, review both the proposed Utilization Plan and the actual performance of the work to determine if particular M/WBEs are performing commercially useful functions.  The participation of M/WBEs that do not perform a commercially useful function shall not be counted.

    a.  An M/WBE performs a commercially useful function when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved. To perform a commercially useful function, the M/WBE must also be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering and, where applicable, installing the materials/supplies, and paying for the materials/supplies from the M/WBE's own funds.  To determine whether an M/WBE is performing a commercially useful function, the Compliance Office shall evaluate the amount of work subcontracted, industry practices, and other relevant factors such as whether the amount the M/WBE is to be paid under the contract is commensurate with the work the M/WBE is actually performing, the M/WBE credit claimed for the performance of the work, and other relevant factors.

    b.  An M/WBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project

through which funds are passed in order to obtain the appearance of M/WBE participation. In determining whether an M/WBE is such an extra participant, the Compliance Office will examine similar transactions, particularly those in which M/WBEs do not participate.

c. If an M/WBE does not perform or exercise responsibility for at least 30 percent of the total cost of its contract with its own forces or the M/WBE subcontracts a greater portion of the work of a contract than would be expected on the basis of normal industry practice for the type of work involved, it shall be presumed that the M/WBE is not performing a commercially useful function. When an M/WBE is not presumed to be performing a commercially useful function as provided in this section, the M/WBE may present evidence to rebut this presumption. The Authority may determine, based on such evidence presented, that the firm is in fact performing a commercially useful function given the type of work involved and normal industry practices.

**2. Determinations of Non-Commercially Useful Function—Appeals Process.**

a. If it appears that an M/WBE has failed to provide a commercially useful function, the Compliance Office shall provide the M/WBE and the Contractor with written notice detailing the reason for the proposed finding, including citations to the applicable rule and supporting evidence.

b. The M/WBE may provide any rebuttal to the Compliance Office within fifteen (15) business days of receipt of notice. The rebuttal must be in writing and must contain a statement explaining the M/WBE's position and the reasons the Compliance Office should make a finding that the M/WBE does perform a commercially useful function. The M/WBE may also submit evidence demonstrating the firm's performance of a commercially useful function.

c. The Compliance Office shall provide the M/WBE and the Contractor with written findings and conclusions regarding the M/WBE's performance of a commercially useful function within fifteen (15) days of receipt of the rebuttal.

d. Unless and until the M/WBE successfully appeals the finding of the Compliance Office, the M/WBE's participation shall not be counted towards the Goals.

**J. Redevelopment Projects**

**1.** Bid preparation and submission shall be conducted in accordance with the Ordinance as follows:

a. For any work to be subcontracted or materials to be supplied, prime contractors shall solicit bids from the respective groups to comply with Ordinance #70767 to the maximum extent possible, referring to the City's Directory.

b. All solicitations shall be made prior to the bid opening and there shall be no negotiation of bids or "bid shopping" by the contracting agency. Contractors bidding on more than one contract must solicit bids from MBEs and WBEs for each contract for which they are bidding regardless of the proximity of the bid dates or the previous lack of responsiveness of MBEs and WBEs.

c. All bids must be advertised 21 days prior to bid submittal date, via publication with local, highest distribution, viewership and via plan rooms monitored, maintained by SLDC Compliance department or any other pre-approved email distribution list.

**2. Bid Submission Requirements.**   The bidder shall include with its bid a definitive statement of the minimum percentage in accordance with Ordinance #70767 participation the bidder commits to achieving in the subcontracting and performance of the Work, on the bid forms prescribed by the Contracting Agency.  Contractors are encouraged to meet with the Compliance Office to discuss the appropriate participation prior to the submission of the bids.  Bidders must submit the following items:

- The Utilization Plan
- Notice of Intent
- Subcontractor List

**3. Bid Review.** The applicable Diversity Office will review all submitted bid documents including the Utilization Plan.

**4. Utilization Plan Review.**

a. Following the utilization plan submittal to the applicable Diversity Office. The applicable Diversity Office will immediately begin a review of the utilization plan submittal and, within ten (10) business days following the utilization plan submittal, will enter the project into the approved compliance software, e.g., GPTS or any other approved software.

b. In reviewing the Utilization Plan and preparing its review documentation, the applicable Diversity Office may include but is not limited to the following:

i. Contact MBEs and WBEs to verify that the apparent low bidder solicited bids from each of them, that the MBE and WBE subcontractor bid amounts listed accurately reflect the amounts actually quoted by those

18

firms and, in the case of those MBE/WBE firms proposed to be utilized by the Prime/General Contractor, that the apparent low bidder has tentative agreements with them in the amounts shown;  the Diversity Office may also request bid submittals from MBE/WBE firms proposed to be utilized by the apparent bidder;

ii.   For work being subcontracted to non-MBE/WBE firms, the applicable Diversity Office will contact the certified MBE and WBE firms in that particular trade, service or supply area to verify that, after solicitation of bids by the proposed prime contractor, the MBE and WBE firms submitted high or non-responsive bids or no bids at all;

iii.  Contact M/WBEs and subcontractors to verify and/or obtain clarification of the information provided in the Notice of Intent and confirm that each M/WBE will perform a Commercially Useful Function in the performance of the Work;

iv.   Seek additional information from the Contractor and/or seek information from the M/WBEs included in the Utilization Plan.  If additional information is requested, the Contractor shall have three (3) business days to provide a response.  If no response is received within three (3) business days, the applicable Diversity Office shall/can deem the Prime/General non-compliant and recommend denial of the tax status.

v.    Request and receive all bid submittals from every subcontractor and all subcontractor agreements and contracts.

**c. Determination as to Utilization Plan Acceptability.**   Within ten (10) business days following Utilization plan submittal, the applicable Diversity Office shall make a recommendation as to the acceptability of the Utilization Plan and communicate that decision to the Prime/General Contractor, using the following procedures and criteria:

i.    Based on the information provided and the information obtained from contacts with M/WBEs and subcontractors, the applicable Diversity Office may adjust the participation amounts included in the Utilization Plan in accordance with the counting provisions of Ordinance# 70767.

i.    If the Utilization Plan, as adjusted, demonstrates that the Contractor will meet or exceed the Goals, the applicable Diversity Office shall make a positive recommendation to the redevelopment office and will issue a preliminary approval letter to the department in favor of the Developer and General/Prime Contractors proceed with the departments approval.

If the Utilization Plan, as adjusted, does not demonstrate that the Contractor will meet the goals but the Contractor has demonstrated a good faith effort including provision of documentation of efforts and a written narrative outlining reasons for failure to achieve the goal, the applicable Diversity Office shall make a positive recommendation to the contracting agency for contract award to the low bidder.

d. **Approved Utilization Plan.** The applicable Diversity Office's participation approval letter and participation worksheet shall be attached to the contract.

5. **Post-Submission Requirements.** Within three (3) business days of contract execution, the contractor must provide the contracting agency and the applicable Diversity Office with fully executed copies of contracts with all subcontractors.

- Bid submittals from all subcontractors
- All subcontractor contracts and agreements from all subcontractors must be submitted to the compliance department and should be consistent with what is reflected on the utilization plan
- A narrative if the goals are not met (at the completion of the project)
- 

6. **Good Faith Effort Review**

If the Utilization Plan does not demonstrate achievement of the M/WBE Goals, the applicable Diversity Office shall review the efforts made by the Contractor to achieve the Goals to determine if the Contractor did in fact make a good faith effort prior to bid opening and forward its recommendation to the Contracting Agency. The applicable Diversity Office shall use the following guidelines in conducting such review.

1. The Contractor shall have taken all necessary and reasonable steps, with such steps having the necessary scope, intensity, and appropriateness, to achieve the M/WBE Goals. Such steps must include personal, frequent and persistent contact with individual M/WBEs and personal contact with the applicable Diversity Office to identify prospective M/WBEs for the work. The distribution of solicitations and/or the placement of plans and bid solicitations in plan rooms or other sources of work frequented by M/WBEs shall not alone be sufficient to demonstrate good faith efforts without such personal, frequent and persistent outreach.

2. The following is a non-mandatory, non-exhaustive, non-exclusive list of types of actions that, together with the personal, frequent and persistent contact described above, the applicable Diversity Office may consider as evidence of good faith efforts to obtain M/WBE participation. Other factors or types of efforts may be relevant depending on the nature of the contract and the types of work involved.

20

a.  Soliciting through all reasonable and available means (e.g. attendance at pre-bid meetings, advertising and/or written notices) the interest of all certified M/WBEs who have the capability to perform the work required by the Contract.  Such solicitations must take place at least fifteen (15) business days prior to the bid opening date to allow M/WBEs sufficient time to prepare bids/proposals and respond to the solicitation, and the Contractor must take appropriate steps to follow such mass solicitations with personal frequent and persistent contact.  The prime contractor should promptly return all calls, faxes and e-mail that it receives from interested M/WBEs.  The follow-up should take the form of a telephone call, fax or e-mail during normal business hours.

b.  Breaking subcontracts down into discrete items or packages that at least some of the M/WBEs in the relevant area may find economically feasible to perform.  The prime contract bidder should not deny a subcontract to an otherwise qualified and competitive M/WBE solely because the latter cannot perform an entire package of related items, but the bidder may deny a request to repackage the work where doing so would jeopardize scheduling, or increase that bidder's cost of performing the original package by an excessive amount.

c.  Efforts made to select portions of the work proposed to be performed by M/WBEs in order to increase the likelihood of achieving the goals, including, where appropriate, but not limited to, breaking down contracts into economically feasible units to facilitate M/WBE participation.  Selection of portions of work are required to at least equal the goal for M/WBE utilization specified in the contract.

d.  Providing M/WBEs with technical assistance and adequate information about the plans, specifications, and requirements of the contract in a timely manner to assist them in responding to a solicitation.  Upon request, the plan holder should permit any interested M/WBE to review the project's plans and specifications at the plan holder's place of business during normal business hours. In addition, the prime contract bidder should have a least one employee available to help the M/WBE identify the specific item(s) in which the latter may have an interest.

e.  Negotiating fairly with interested M/WBEs, even when selecting an M/WBE contractor or subcontractor may increase the cost of the work; however, where two or more quotes cover the same item(s) of work, the prime contractor bidder should have the discretion to accept the low quote.

f.  Fairly and thoroughly evaluating the capabilities of particular M/WBEs before accepting or rejecting their bids or proposals.  An M/WBE's standing within its industry, membership in specific groups, organizations, and

21

associations and political or social affiliations are not legitimate causes for the rejection or non-solicitation of bids in the Contractor's efforts to meet the Goals.

g.  Not denying a subcontract to an otherwise qualified and competitive, and if necessary, certified M/WBE solely because the latter cannot provide a performance or payment bond for the work, unless the bidder's bonding is contingent upon bonding for all subcontractors.

  i.  Making efforts to assist interested M/WBEs in obtaining bonding, lines of credit, or insurance as required by the bid or contract documents.

h.  Effectively using the services of the applicable Diversity Office to provide assistance in the recruitment and placement of M/WBEs.

i.  Assigning a senior official the responsibility of serving as a liaison between the firm and the M/WBES in the relevant area (independent and apart from its interest in any one project).

j.

  The applicable Diversity Office may consider the percentages of minority and women participation submitted by other bidders in conjunction with their bids in determining whether a Contractor has made good faith efforts. For example, when the apparent low bidder fails to meet the Goals, but other bidders have met the Goals, the applicable Diversity Office may consider whether, with additional reasonable efforts, the apparent low bidder could have met the goal. Conversely, if the apparent low bidder fails to meet the Goals but equals or exceeds the participation levels specified in the second-lowest bid or the average M/WBE participation levels specified in the other bids, the applicable Diversity Office may view this, in conjunction with other factors, as evidence of the apparent low bidder's good faith efforts.

3.  The ability or desire of a contractor or general contractor, consultant, supplier, or other entity working with the Contractor to perform the work of a contract with its own forces rather than via a subcontract does not relieve the bidder of the responsibility to make good faith efforts to fully achieve the Goals.

**7.  Redevelopment Projects Counting M/WBE Participation**

  **1.  Certification Required.**  Only the participation of MBEs and WBEs certified by the Authority prior to the bid opening shall be credited towards the Goals. An entity must be certified as an MBE and/or WBE in the specific area of the North American Industry Classification System (NAICS) code before the firm's work in that particular area may be credited towards the Goals.

  **2.  Performance of a Commercially Useful Function Required Through the Contract Duration.**  A certified M/WBE must perform a Commercially

Useful Function, as determined by the applicable Diversity Office in accordance with the provisions below, in order for such firm's work to be credited towards the Goals.  To determine whether an MBE or WBE is performing a commercially useful function, the Diversity Office will evaluate the amount of work subcontracted, industry practices, and other relevant factors listed below.  For instance, payment to the M/WBE under the contract must be commensurate with the work the M/WBE is actually performing and the M/WBE credit claimed for the performance of the work.  The participation of M/WBEs that do not perform a Commercially Useful Function shall not be counted.

3. **Authority Approval Required for Changes.**

    **a.** Whenever additional contract supplements, extra work orders, or change orders are made that individually, or in the aggregate, increase the total dollar value of the original contract, the contractor must maintain the level of MBE and WBE participation as established in the original contract.  If the Contractor is unable to meet its M/WBE contractual commitment, it must submit documentation of reasons for failure to meet the goals and must be approved by the applicable Diversity Office.

    b. **Substitutions**: No Contractor shall change any subcontractor list unless a Substitution Form is submitted in writing to and approved in writing by the applicable Diversity Office.  The applicable Diversity Office shall approve an amendment to the Utilization Plan within five (5) business days from submission of the request for an amendment in the following circumstances:

        1. The certified MBE or WBE is no longer available or willing to perform the work with approved documentation; and

    a. The Contractor is proposing to replace the M/WBE included in the original Utilization Plan with another M/WBE whose subcontract will be in an amount equal to or greater than the originally included M/WBE and such replacement is otherwise equal (e.g., the Contractor proposes to replace an MBE with an MBE and a WBE with a WBE with the same Certifications); or

    b.    The Contractor demonstrates to the satisfaction of the Compliance Office that such replacement is not possible because (a) there is no comparable MBE or WBE available to perform the work, or (b) the performance of the overall contract Work has progressed to the stage where the insertion of a new MBE or WBE subcontractor would unacceptably delay completion of the Work.

**K.  Joint Ventures.**

23

Joint ventures between M/WBEs and non-M/WBEs may count towards M/WBE participation if the joint venture requests approval from the Compliance Office, is approved by the Compliance Office and one or more of the joint venture participants are certified as an M/WBE.

1. **Eligibility.**

   a. The M/WBE joint venture participant must be certified in the area of expertise to be undertaken by the joint venture.

   b. A holding company cannot be an M/WBE participant in a joint venture.

   c. The M/WBE must not be an affiliate of the non-M/WBE firm as described in Part II.E.15.

2. **Joint Venture Review.** Joint venture agreements must clearly address capital contribution, control, management, risks, profits, ownership, and work to be performed by the M/WBE.

   a. M/WBE capital contribution, control management, risks, and profits must be commensurate with its ownership interest.

   b. Each party in a joint venture should bring real and substantial value to the joint venture enterprise, including both tangible and intangible assets, capital commensurate with their ownership interest, knowledge and skills relative to the portion of the joint venture's business for which they are responsible, and efforts to the success of the venture.

   c. The profit or loss of the joint venture should be distributed between the participants in proportion to the interest in the joint venture.

   d. The joint venture must have a business structure set forth in a signed written agreement that clearly and specifically defines the participation of each party in the contribution of property, capital, efforts, skills and knowledge.

   e. Once approved, there are no annual updates required for joint venture agreements.   However, proposed material changes in the joint venture agreement, including management responsibilities among the participants, ownership, or control, should be submitted to the Program.

3. **Counting Joint Ventures.**

   a. A portion of the total dollar value of a contract with a joint venture equal to the percentage of MBE or WBE participation in the joint venture may be counted as MBE or WBE participation. The MBE or WBE participant in the

24

joint venture must be responsible for a clearly defined portion of the work to be performed, equal to a share in the ownership, control, management, responsibility, risks and profits of the joint venture.

b. The joint venture must operate in accordance with the submitted joint venture agreement.  If it is determined that the M/WBE has not performed its role in accordance with the joint venture agreement and has in fact participated less than expected, participation may be counted at an amount less than originally approved.

**L.  Performance of a Commercially Useful Function.**

**1.  Commercially Useful Function Required.**  The Compliance Office shall, using the following criteria, review both the proposed Utilization Plan and the actual performance of the work to determine if particular M/WBEs are performing commercially useful functions.  The participation of M/WBEs that do not perform a commercially useful function shall not be counted.

a. An M/WBE performs a commercially useful function when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved. To perform a commercially useful function, the M/WBE must also be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering and, where applicable, installing the materials/supplies, and paying for the materials/supplies from the M/WBE's own funds.  To determine whether an M/WBE is performing a commercially useful function, the Compliance Office shall evaluate the amount of work subcontracted, industry practices, and other relevant factors such as whether the amount the M/WBE is to be paid under the contract is commensurate with the work the M/WBE is actually performing, the M/WBE credit claimed for the performance of the work, and other relevant factors.

b. An M/WBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of M/WBE participation.   In determining whether an M/WBE is such an extra participant, the Compliance Office will examine similar transactions, particularly those in which M/WBEs do not participate.

c. If an M/WBE does not perform or exercise responsibility for at least 30 percent of the total cost of its contract with its own forces or the M/WBE subcontracts a greater portion of the work of a contract than would be expected on the basis of normal industry practice for the type of work involved, it shall be presumed that the M/WBE is not performing a

25

commercially useful function.  When an M/WBE is not presumed to be performing a commercially usefulfunction as provided in this section, the M/WBE may present evidence to rebut this presumption.  The Authority may determine, based on such evidence presented, that the firm is in fact performing a commercially useful function given the type of work involved and normal industry practices.

**M. Reporting Requirements.**

   **1**.  **During performance of the contract- Public Works Contracts.**

     a.  At a minimum, the Compliance Office shall require Contractors to submit a monthly report of payments.  The report shall, at a minimum, include a listing of MBEs/WBEs participating in the contract, the amount of the contract, how much of the contract has been paid to date, and copies of invoices. Reporting shall be done through GPTS or any other approved compliance reporting software.

     b.  The Compliance Office shall review all reports submitted by the Contractor for conformance with the approved Utilization Plan within fifteen (15) days of receipt and shall notify the Contractor in writing within such fifteen (15) day period whether or not the report is acceptable.  If the Compliance Office determines that the report is not acceptable, the Compliance Office shall state the reasons for such determination in its written notification to the Contractor.

   **2**.  **Contract completion- Public Works Contracts.**

     a.  At contract completion, the Contractor shall notify the Contracting Agency and the Compliance Office of completion of the Work and provide the Contracting Agency and the Compliance Office with final documentation of MBE and WBE participation.

     b.  Within thirty (30) days following the Contractor's notification to the Compliance Office of completion of the Work, the Compliance Office shall provide the Contractor with a close-out report stating the final amount of approved MBE and WBE participation in the Contract on the form attached hereto as Exhibit 12.  The Compliance Office shall provide the Contracting Agency with copies of all reports submitted by the Contractor and issued by the Compliance Office and all Compliance Office correspondence with respect to the reports.

     c.  The contracting agency must have complete and acceptable documentation as determined by the Compliance Office of amounts paid to all project MBE and WBE subcontractors on file before the final payment is made to the prime contractor.

**3. Requests for Information.**   The Contractor and all subcontractors shall promptly respond to all Compliance Office requests for information pertaining to reports and compliance with these Rules within the timelines set forth in the request.   Requests for additional time must be submitted to the Compliance Office in writing. If the Contractor or any subcontractor believes that the request for information is unduly intrusive, such Contractor or Subcontractor shall state the reasons for such belief in writing and provide such statement to the Director. The Director shall review the request and the Contractor/Subcontractor statement and shall determine whether or not to withdraw the request.

**4. Affirmative Duty to Report.**   The Contractor and all Subcontractors shall promptly report to the Compliance Office any change that impacts compliance with the Utilization Plan or an M/WBE's performance of a Commercially Useful Function, and/or M/WBE certification eligibility within 30 days of such change.

**N. Compliance Review During Contract Performance.**

All Contractors and Subcontractors shall provide copies of all contracts and subcontracts associated with the prime contract at the outset of contract execution and shall afford the Compliance Office  access to all books and records pertaining to the City Contracting Opportunity at the  Compliance Office's request, except, however, Contractors and Subcontractors need not provide the Authority with access to proprietary information or trade secrets, however contracts and subcontracts shall not be deemed proprietary or trade secrets.  All site visits conducted for the purpose of evaluating books and records at the principal place of business should be scheduled. All site visits conducted for the purpose of observing operations and/or evaluating worksite documents may be unscheduled.

**1. Site Visits—Non-Construction Projects.**
   a. **M/WBE Principal Place of Business.**  The Contracting Agency and/or the Compliance Office may conduct one or more site visits to an M/WBE's principal place of business, temporary, or satellite offices to evaluate records and operations to ensure compliance with these rules. The M/WBE shall maintain copies of all subcontracts related to the Project at the M/WBE's principal place of business.
   b. **Site visits can be announced and unannounced.** Announced the project superintendent is made aware and are scheduled at the convenience of the project superintendent; unannounced the visiting agency will check-in at the project office and announce their arrival to the project superintendent to begin their site visit.

   c. **General Contractor's Principal Place of Business.**   The Contracting Agency and/or the Compliance Office may conduct one or more site visits to the general Construction Contractor's principal place of business, temporary, or satellite offices to evaluate records and operations to ensure compliance

27

with these rules. The general contractor shall maintain copies of all subcontracts related to the Project at the general contractor's principal place of business.

2. **Site Visits—Construction Projects.**

a. **Project site.** The Contracting Agency and/or the Compliance Office shall conduct site visits to the project site to observe operations and evaluate on-site documents, ensure that M/WBE contractors are working within their areas of expertise, and are performing the work described in the contract and as stated in the approved Utilization Plan. The Compliance Office will ensure the M/WBE has the workforce on its payroll required to complete the work described in the Utilization Plan. The compliance officer may attend any project meetings ongoing at the time of the visit. The compliance officer may examine and observe all records and documents on-site, including financial documents, equipment, work, project site, and interactions between the contractor and M/WBE at time of visit to evaluate compliance with these Rules. The Contractor shall maintain copies of all subcontracts and sub-subcontracts on the jobsite.

b. **M/WBE Principal Place of Business.** The Contracting Agency and/or the Compliance Office may conduct one or more site visits to an M/WBE's principal place of business, temporary, or satellite offices to evaluate records and operations to ensure compliance with these rules.

c. **Prime/General Contractor's Principal Place of Business.** The Contracting Agency and/or the Compliance Office may conduct one or more site visits to the Prime/General Contractor's principal place of business, temporary, or satellite offices to evaluate records and operations to ensure compliance with these rules.

3. **Communications with Subcontractors.**

The Compliance Office may communicate directly with M/WBE and other subcontractors to verify information contained in any or all reports and/or records, M/WBE performance of commercially useful functions, and M/WBE control of the work and the business entity during the performance of the Contract. Such communications may include the review of documentation to payments to M/WBEs and review of payments from M/WBEs.

O. **Contractor/Subcontractor Maintenance of Records; Review After Contract Completion; Patterns of Willful Non-Compliance or Misrepresentation.**

All Contractors and subcontractors that perform Work pursuant to a City Contracting Opportunity shall retain all records related to the City Contracting Opportunity for a period of three (3) years following the Compliance Office's issuance of a close-out

28

report.  During such three (3) year period, if the Compliance Office believes that any Contractor or Subcontractor has failed to comply with these Rules in any subsequent City Contracting Opportunity, the Compliance Office may review records relating to previous City Contracting Opportunities for the purpose of determining whether a pattern of willful noncompliance exists. If a pattern of willful non-compliance and/or misrepresentation is determined to exist and is documented, the Compliance Office may seek withhold liquidated damages from any Contractors and Subcontractors involved in such willful noncompliance and/or misrepresentation as provided in these Rules.

**P.  Payments to M/WBE and Other Contractors and Subcontractors.**

All contractors and subcontractors must issue payment to lower tier subcontractors in accordance with the Missouri Prompt Payment Act.

**Q.  Remedies**

A Contractor who fails to comply with the Compliance requirements set forth in this Part, and including the timely and accurate filing of reports, contracts and subcontracts required herein, or knowingly and willfully provide false, erroneous, misleading or incorrect information or statements in connection with any material aspect of the Program or these Rules, such matter shall be immediately investigated by the Compliance Officer. Remedies may include one or more of the following:

1)  Remedies at law or in equity negotiated by the parties to the Contract;

2)  Remedies authorized under Ordinance 70767, as may be amended from time to time:

    a)  Disqualification of bidder or proposer and the withholding of Contract award;

    b)  Suspension, termination or rescission of the Contract;

    c)   Disqualification from eligibility to submit a bid or proposal for a Contract for a period not to exceed one year; and

    d) Imposition of liquidated damages as more fully described below.

        (i) All Contracts that contain participation goals for MBE/WBE businesses must contain a provision that provides for the imposition of liquidated damages in the absence of a finding of Good Faith Efforts in the event the Contractor fails to achieve the participation goals specified in the Contract. The amount of liquidated damages will be assessed based upon the M/WBE goal shortfall and will be the difference between the goal set in the Contract and the amounts paid to M/WBE contractor. To the extent permitted by law, funds received as liquidated damages will be provided to St. Louis Development Corporation and used to provide business development and enhancement services for M/WBEs.

(ii)   Retention Amounts for Public Works Contracts

Liquidated damages on Public Work Contracts will be assessed during the project close-out by the Compliance Office and the President of the Board of Public Service and, if an Airport Public Works Contract, the Director of Airports and the Airport Authority Compliance Office. The President of the Board of Public Service and Compliance Officer shall establish in a separate account the appropriate retention amount for liquidated damages in addition to any other retention amount held under the Public Work Contract.

(iii) Service Agreements and Professional Services Agreements (Non-Public Works Contacts)

Liquidated damages on any service contract or professional service contract for work performed for any Contracting Agency, should be assessed prior to the expiration of the Contract (generally not sooner than 6 months prior to the expiration date) The City shall periodically evaluate the Contractor's compliance with the contract goals and determine whether the Contractor has performed in accordance with the Contract. If the Contractor has failed to perform as described above, then the City may impose liquidated damages as provided herein to be withheld from any amounts due and owed the Contractor; such liquidated damage withheld must be authorized by the City Compliance Officer and the Contracting Agency.

## PART III.  CERTIFICATION

**A. Objectives.**

This Part describes the requirements in certifying a business entity as an MBE and/or WBE for participation in City contracting opportunities.

**B. Burden of Proof.**

The firm seeking Certification has the burden of demonstrating, by a preponderance of the evidence, that it meets the requirements of this subpart concerning group membership, ownership and control.

**1.  Review.**   Determinations concerning whether individual(s) and/ or firm(s) have met their burden of proof, by a preponderance of the evidence, that it meets group membership, ownership, and control is considered by all the facts in the record, viewed as a whole.

**C. Rebuttable Presumption of Status as Minority or Woman.**

It is rebuttably presumed that citizens of the United States (or lawfully admitted permanent residents) who are Women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, or other minorities found to be disadvantaged by the Small Business Administration have historically experienced social and economic disadvantage. This means they do not have the burden of proving that they have historically experienced social and economic disadvantage.

**1. Group Membership.** In order to obtain the benefit of the rebuttable presumption, individuals must submit a signed and notarized statement that they are, in fact, a member of that group.

**2. Rebutted Presumptive Group Membership**. If, after reviewing the signed and notarized statement of membership in a presumptively disadvantaged group, there is a well-founded reason to question the individual's claim of membership in that group, the Authority may, at any time, start a proceeding to determine whether the presumption should be regarded as rebutted with respect to that individual. Your proceeding must follow the procedures of section (H).

a. In such a proceeding, the Authority has the burden of demonstrating, by a preponderance of the evidence, that the individual is not socially and economically disadvantaged. The Authority may require the individual to produce information relevant to the determination of his or her disadvantage.

b. In implementing this section, the Authority must take special care to ensure that there is no disproportionate burden on members of any particular designated group. Imposing a disproportionate burden on members of a particular group could violate Title VI of the Civil Rights Act of 1964.

**3. Individuals not presumed to be Socially and Economically Disadvantaged.** Individuals who are not presumed to be socially and economically disadvantaged, and individuals concerning whom the presumption of disadvantage has been rebutted, have the burden of proving, by a preponderance of the evidence, that they are socially and economically disadvantaged.

a. In making such a determination, consider whether the person has held himself out to be a member of the group over a long period of time prior to application for certification and whether the person is regarded as a member of the group by the relevant community. The Authority may require the applicant to produce appropriate documentation of group membership.

b. If it is determined that an individual claiming to be a member of a group presumed to be disadvantaged is not a member of a designated disadvantaged group, the individual must demonstrate social and economic disadvantage on an individual basis.

**4. Individual basis of minority and social and economic disadvantage.** Individuals who are not presumed to be socially and economically disadvantaged, and individuals concerning whom the presumption of disadvantage has been rebutted, have the burden of proving, by a preponderance of the evidence, that they are members of such group or that they are socially and economically disadvantaged.

a. The Authority must make a case-by-case determination of whether each individual whose ownership and control are relied upon for M/WBE certification is a member of a group who has historically been socially and economically disadvantaged or is an individual who is socially and economically disadvantaged.

b. Evidence of individual social and economic disadvantage include the following elements:

i. At least one objective distinguishing feature that has contributed to social and economic disadvantage, such as race, ethnic origin, gender disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially and economically disadvantaged;

ii. Personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and

iii. Negative impact on entry into or advancement in the business world because of the disadvantage. In every case, the Applicant's education, employment, and business history will be considered, where applicable, to see if the totality of the circumstances shows socially and economically disadvantage.

**D. Ownership.**

In determining whether the minority, women or socially and economically disadvantaged participants in a firm own the firm, consider all the facts in the record viewed as a whole, including the origin of all assets and how and when they were used in obtaining the firm. All transactions for the establishment and ownership (or transfer of ownership) must be in the normal course of business, reflecting commercial and arms-length practices.

**1. Majority Ownership and Permitted Forms of Ownership**. In order to be eligible for Certification, a minimum of 51% must be owned by socially and economically disadvantaged individual(s).

a. In the case of a corporation, such individuals must own at least 51 percent of each class of voting stock outstanding and 51 percent of the aggregate of all stock outstanding.

b. In the case of a partnership, 51 percent of each class of partnership interest must be owned by socially and economically disadvantaged individuals. Such ownership must be reflected in the firm's partnership agreement.

c. In the case of a limited liability company, at least 51 percent of each class of member interest must be owned by socially and economically disadvantaged individual(s).

**2. Real, Substantial and Continuing Ownership.** The firm's ownership by disadvantaged individuals, including their contribution of capital or expertise to acquire their ownership interests, must be real, substantial, and continuing, going beyond pro forma ownership of the firm as reflected in ownership documents.

a. Examples include:

(i)  An individual pays $100 to acquire a majority interest in a firm worth $1 million. The individual's contribution to capital would not be viewed as substantial.

(ii) A 51% disadvantaged owner and a non-disadvantaged 49% owner contribute $100 and $10,000, respectively, to acquire a firm grossing $1 million. This may be indicative of a pro forma arrangement that does not meet eligibility.

(iii) The disadvantaged owner of a M/WBE Applicant firm spends $250 to file articles of incorporation and obtains a $100,000 loan but makes only nominal or sporadic payments to repay the loan. This type of contribution is not of a continuing nature.

b. The disadvantaged owners must enjoy the customary incidents of ownership and share in the risks and profits commensurate with their ownership interests, as demonstrated by the substance, not merely the form, of the firm's arrangements. Any terms or practices that give a non-disadvantaged individual or firm a priority or superior right to a firm's profits, compared to the disadvantaged owners(s), are grounds for denial.

c. Debt instruments from financial institutions or other organizations that lend funds in the normal course of their business do not render a firm ineligible, even if the debtor's ownership interest is security for the loan.

**3. Capitalization Required.** Proof of capitalization is required with the application. When the contribution of capital is through a loan, there must be documentation of the value of assets used as collateral for the loan. Insufficient contributions of capital or expertise shall include, but are not limited to:

a. a promise to contribute capital or expertise in the future;
b. an unsecured note payable to the firm or an owner who is not a disadvantaged individual;
c. mere participation in a firm's activities as an employee;

33

d. capitalization not commensurate with the value of the firm;
e. using assets of the applicant firm to repay for the purchase of ownership in that same firm.

**4. Securities.** All securities and/or assets that constitute ownership of a firm shall be held directly by socially and economically disadvantaged individuals. Except as provided in this paragraph, securities held by any guardian for a minor are not considered as held by disadvantaged persons in determining ownership.

**5. Trusts.** All securities and/ or assets held in trust are regarded as held by a disadvantaged individual for purposes of determining ownership of the firm if:

(a) The beneficial owner of securities or assets held in trust is a disadvantaged individual, and the trustee is the same; or

(b) The beneficial owner of a trust is a disadvantaged individual who, rather than the trustee, exercises effective control over the management, policy-making, and daily operational activities of the firm. Assets held in a revocable living trust may be counted only in the situation where the same disadvantaged individual is the sole grantor, beneficiary, and trustee

**6. Expertise as Contribution.** The following requirements apply to situations in which expertise is relied upon as part of a socially and economically disadvantaged owner's contribution to acquire ownership:
(a) The owner's expertise must be-
(i)  In a specialized field;
(ii) Of outstanding quality;
(iii) In areas critical to the firm's operations;
(iv)  Indispensable to the firm's potential success;
(v) Documented in the records of the firm. These records must clearly show the contribution of expertise and its value to the firm.

(b) The individual whose expertise is relied upon must have a significant financial investment in the firm.

**7. Capitalization by Divorce, Separation or Inheritance**. The Authority must always deem as held by a socially and economically disadvantaged individual, for purposes of determining ownership, all interests in a business or other assets obtained by the individual—

(a) As the result of a final property settlement or court order in a divorce or legal separation, provided that no term or condition of the agreement or divorce decree is inconsistent with this section; or

(b) Through inheritance, or otherwise because of the death of the former owner.

**8. Interests Not Qualifying as Capitalization/Ownership.**

34

It is presumed that all interests in a business or other assets obtained by the individual as the result of a gift, or transfer without adequate consideration, is insufficient to demonstrate capitalization in ownership.

(a) However, to overcome this presumption and permit the interests or assets to be counted, the socially and economically disadvantaged individual must demonstrate, by clear and convincing evidence, that—

(i) The gift or transfer to the disadvantaged individual was made for reasons other than obtaining certification as a M/WBE; and

(ii) The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who provided the gift or transfer.


**9. Capitalization via Marital Assets.**  When marital assets (other than the assets of the business in question), held jointly or as community property by both spouses, are used to acquire the ownership interest asserted by one spouse, the Authority must deem the ownership interest in the firm to have been acquired by that spouse with his or her own individual resources, provided that the other spouse irrevocably renounces and transfers all rights in the ownership interest.

(a)  A copy of the document legally transferring and renouncing the other spouse's rights in the jointly owned or community assets used to acquire an ownership interest in the firm must be included as part of the firm's application for M/WBE certification**.**

**10. Applicant Not To Be Denied Due To Individual Factors Alone.** The Authority must not regard a contribution of capital as failing to be real and substantial, or find a firm ineligible solely because—

(a) A socially and economically disadvantaged individual acquired his or her ownership interest as the result of a gift or transfer, or

(b) There is provision for the co-signature of a spouse who is not a socially and economically disadvantaged individual on financial agreements, contracts for the purchase or sale of real or personal property, bank signature cards, or other documents; or

(c) Ownership of the firm in question or its assets if transferred for adequate consideration from a spouse who is not a socially and economically disadvantaged individual to a spouse who is such an individual.

(d) In these cases, the Authority must give particularly close and careful scrutiny to the ownership and control of the firm to ensure that it is owned and controlled,

in substance as well as in form, by a socially and economically disadvantaged individual.

**E. Control.**

In order to be eligible for M/WBE Certification, an Applicant must be controlled by socially and economically disadvantaged individual(s). In determining whether an Applicant controls a firm, all the facts in the record must be viewed as a whole.

1. **Independence**. Only an independent business may be certified as a M/WBE. An independent business is one the viability of which does not depend on its relationship with another firm or firms. In determining whether a potential M/WBE is an independent business, the Authority must:

> (a) scrutinize relationships with non-M/WBE firms, in such areas as personnel, facilities, equipment, financial and/or bonding support, and other resources.

> (b) consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential M/WBE and non-M/WBE firms or persons associated with non-M/WBE firms compromise the independence of the potential M/WBE firm.

> (c) examine the firm's relationships with prime contractors to determine whether a pattern of exclusive or primary dealings with a prime contractor compromises the independence of the potential M/WBE firm.

> (d) In considering factors related to the independence of a potential M/WBE firm, the Authority must consider the consistency of relationships between the potential M/WBE and non-M/WBE firms with normal industry practice.

**2. Restrictions on Decision-Making Authority.** An M/WBE firm must not be subject to any formal or informal restrictions that limit the customary discretion of the Applicant. There can be no restrictions through corporate charter provisions, by-law provisions, contracts or any other formal or informal devices (e.g., cumulative voting rights, voting powers attached to different classes of stock, employment contracts, requirements for concurrence by non-disadvantaged partners, conditions precedent or subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights) that prevent the Applicant from making any business decision of the firm.

**3. Management Authority.** The socially and economically disadvantaged individual must possess the power to direct or cause the direction of the management and policies of the firm and to make day-to-day as well as long-term decisions on matters of management, policy and operations.

> (a) A disadvantaged owner must hold the highest position in the company (e.g., chief executive officer or president).

(b) In a corporation, disadvantaged owners must control the board of directors.

(c) In a partnership, one or more disadvantaged owners must serve as general partners, with control over all partnership decisions.

**4. Non-Minority/Non-Women Involvement.** Individuals who are not socially and economically disadvantaged or immediate family members may be involved in an M/WBE firm as owners, managers, employees, stockholders, officers, and/or directors. Such individuals must not, however, possess or exercise the power to control the firm or be disproportionately responsible for the operation of the firm.

**5. Delegation.** The Applicant may delegate various areas of the management, policymaking, or daily operations of the firm to other participants in the firm, regardless of whether these participants are socially and economically disadvantaged individuals. Such delegations of authority must be revocable, and the socially and economically disadvantaged owners must retain the power to hire and fire any person to whom such authority is delegated. The managerial role of the socially and economically disadvantaged owners in the firm's overall affairs must be such that the recipient can reasonably conclude that the socially and economically disadvantaged owners actually exercise control over the firm's operations, management, and policy.

**6. Managerial Expertise and Competence**. The socially and economically disadvantaged owner(s) must have an overall understanding of, and managerial and technical competence and experience directly related to the type of business in which the firm is engaged and the firm's operations.

(a) The socially and economically disadvantaged owners are not required to have experience or expertise in every critical area of the firm's operations, or to have greater experience or expertise in a given field than managers or key employees.

(b) The socially and economically disadvantaged owners must have the ability to intelligently and critically evaluate information presented by other participants in the firm's activities and to use this information to make independent decisions concerning the firm's daily operations, management, and policymaking.

(c) Generally, expertise limited to office management, administration, or bookkeeping functions unrelated to the principal business activities of the firm is insufficient to demonstrate control.

**7. Licensing.**

(a) If federal, state or local law requires a person to have a particular license or other credential in order to own and/or control a certain type of firm, the socially and economically disadvantaged individual who owns and controls a potential M/WBE firm of that type must possess the required license or credential. If state or local law does not require such a person to have such a license or credential to

37

own and/or control a firm, the Authority must not deny certification solely on the ground that the person lacks the license or credential. However, the Authority may take into account the absence of the license or credential as one factor in determining whether the socially and economically disadvantaged owners actually control the firm.

(b) If a license(s) is necessary to perform the tasks associated with the area of expertise the Applicant seeks, the Applicant must employ a sufficient number of licensed personnel to perform work and maintain capacity for the contract size and area of expertise sought.

**8. Renumeration.** The socially and economically disadvantaged person must receive fair remuneration as compared to the other participants in the business entity in the context of the duties of the persons involved, normal industry practices, the business entity's policy and practice concerning reinvestment of income.

**9. Other Employment.** In order to be viewed as controlling a firm, a socially and economically disadvantaged owner(s) cannot engage in outside employment or other business interests that conflict with the management of the firm or prevent the individual from devoting sufficient time and attention to the affairs of the firm to control its activities. For example, absentee ownership of a business and part-time work in a full-time firm are not viewed as constituting control. However, an individual could be viewed as controlling a part-time business that operates only on evenings and/or weekends, if the individual controls it all the time it is operating.

**10. Immediate Family Members.** A socially and economically disadvantaged individual may control a firm even though one or more of the individual's immediate family members (who themselves are not socially and economically disadvantaged individuals) participate in the firm as a manager, employee, owner, or in another capacity. Except as otherwise provided in this paragraph, the Authority must make a judgment about the control the socially and economically disadvantaged owner exercises vis-à-vis other persons involved in the business as in other situations, without regard to whether or not the other persons are immediate family members.

**11. Transfers of Control.** Where a business entity was formerly owned and/or controlled by a non-disadvantaged individual (whether or not an immediate family member), ownership and/or control were transferred to a socially and economically disadvantaged individual, and the individual remains involved with the firm in any capacity, there is a rebuttable presumption of control by the non-disadvantaged individual unless the disadvantaged individual now owning the firm demonstrates, by clear and convincing evidence, that:

(1) The transfer of ownership and/or control to the disadvantaged individual was made for reasons other than obtaining certification as a MWBE; and

38

(2) The disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a non-disadvantaged individual who formerly owned and/or controlled the firm.

**12. Equipment.** In determining whether a firm is controlled by its socially and economically disadvantaged owners, evaluate whether the firm owns equipment necessary to perform its work. However, the Authority must not determine that a firm is not controlled by socially and economically disadvantaged individuals solely because the firm leases, rather than owns, such equipment, where leasing equipment is a normal industry practice and the lease does not involve a relationship with a prime contractor or other party that compromises the independence of the firm.

(a) Special considerations for M/WBE Trucking Companies.

i. The firm must be responsible for the management and supervision of the entire trucking operation for which it is responsible on contracts; there cannot be a contrived arrangement for the purpose of meeting M/WBE goals;

ii. The firm must own and operate at least one fully licensed, insured and operational truck;

iii. The firm may lease additional trucks from another M/WBE firm certified by the City, including an owner-operator;

iv. The firm may lease additional trucks from a non-M/WBE frim, including from an owner-operator if it demonstrates it has an executed lease in place between the non-M/WBE firms to lease trucks.

**13. NAICS Code Expansion.** The socially and economically disadvantaged owner(s) must demonstrate the ability to control the firm in the specific type(s) or work in which the firm seeks certification whether on initial certification or upon a request for certification in an additional type of work, by completing a NAICS Code Expansion Application.

(a) To become certified in an additional type of work, the firm need not to submit a new application for certification, but must verify that the socially and economically disadvantaged owners are able to control the firm in the additional type of work by completing a NAICS Code Expansion Application.

(b) The firm's areas of expertise should be described in terms that are specific. Multiple areas of expertise may be assigned where appropriate.

(c) The firm bears the burden of providing any detailed company information that the Authority needs to make an appropriate area of expertise designation.

(d) The Authority is not precluded from changing an area of expertise if there is a factual basis in the record.

**14. Franchises and License Arrangements.**  A business operating under a franchise or license agreement may be certified if it meets the standards in this subpart and the franchiser or licenser is not affiliated with the franchisee or licensee. In determining whether affiliation exists, generally do not consider the restraints relating to standardized quality, advertising, accounting format, and other provisions imposed on the franchisee or licensee by the franchise agreement or license, provided that the franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. Alternatively, even though a franchisee or licensee may not be controlled by virtue of such provisions in the franchise agreement or license, affiliation could arise through other means, such as common management or excessive restrictions on the sale or transfer of the franchise interest or license.

**F. Additional Rules Affecting Certification.**

**1. Local Firm.** A business entity authorized to do business in the State of Missouri that maintains a facility within the St. Louis Metropolitan Statistical Area with adequate personnel, equipment, materials and facilities to perform its local work in the NAICS Codes requested.

**2. Eligibility Based on Present Circumstances**. Eligibility must be based on present circumstances. An Applicant will not be denied certification based solely on historical information indicating a lack of ownership or control of the firm by socially and economically disadvantaged individuals at some time in the past, if the firm currently meets the ownership and control standards of this part. The Authority must not refuse to certify a firm solely on the basis that it is a newly formed firm, has not completed projects or contracts at the time of its application, has not yet realized profits from its activities, or has not demonstrated a potential for success. If the firm is owned by socially and economically disadvantaged individual(s) and meets ownership and control requirements of this part, the firm is eligible for certification.

**3. History of Attempts to Subvert.** The Authority may consider, in making certification decisions, whether a firm has exhibited a pattern of conduct indicating its involvement in attempts.

**4. Failure to Cooperate.** M/WBE firms and firms seeking M/WBE certification shall cooperate fully with requests for information relevant to the certification process. Failure or refusal to provide such information is grounds for a denial or decertification.

**5. Eligible Firms.** Not-for-profit organizations, even though controlled by socially and economically disadvantaged individuals, are not eligible to be certified as M/WBEs.

**6. Commercially Useful Function.** Consideration of whether a firm performs a commercially useful function pertains solely to the compliance aspects of these Rules as set forth in Part II. Issues of commercially useful functions will not be considered in any way in making decisions about whether to certify a firm as a W/MBE.

**7. Subsidiaries.** A business entity that is owned by another business entity (rather than individuals), is only eligible for Certification if the following conditions are met:

(a) Socially and economically disadvantaged owner(s), as applicable, own and control a business entity through a parent/holding company, established for tax, capitalization or other purposes consistent with industry practice, and the socially and economically disadvantaged owner(s) of the parent/holding company control the subsidiary through the parent/holding company; and

(b) Cumulative ownership by socially and economically disadvantaged owner(s), as applicable, in the subsidiary is at least 51%. Examples include:

(i) *Example 1:* Socially and economically disadvantaged individuals own 100 percent of a holding company, which has a wholly-owned subsidiary. The subsidiary may be certified, if it meets all other requirements.

(ii) *Example 2:* Disadvantaged individuals own 100 percent of the holding company, which owns 51 percent of a subsidiary. The subsidiary may be certified, if all other requirements are met.

(iii) *Example 3:* Disadvantaged individuals own 80 percent of the holding company, which in turn owns 70 percent of a subsidiary. In this case, the cumulative ownership of the subsidiary by disadvantaged individuals is 56 percent (80 percent of the 70 percent). This is more than 51 percent, so the Authority may certify the subsidiary, if all other requirements are met.

(iv) *Example 4:* Same as Example 2 or 3, but someone other than the socially and economically disadvantaged owners of the parent or holding company controls the subsidiary. Even though the subsidiary is owned by disadvantaged individuals, through the holding or parent company, the Authority cannot certify it because it fails to meet control requirements.

(v) *Example 5:* Disadvantaged individuals own 60 percent of the holding company, which in turn owns 51 percent of a subsidiary. In this case, the cumulative ownership of the subsidiary by disadvantaged individuals is about 31 percent. This is less than 51 percent, so the Authority cannot certify the subsidiary.

(vi) *Example 6:* The holding company, in addition to the subsidiary seeking certification, owns several other companies. The combined gross receipts of the holding companies and its subsidiaries are greater than the size standard for the subsidiary seeking certification and/or the gross

41

receipts cap of §26.65(b). Under the rules concerning affiliation, the subsidiary fails to meet the size standard and cannot be certified.

**8. Third Party Complaints.** Any person or entity, including a City Department Contracting Agency, may file a written complaint with the Authority alleging that a certified firm is ineligible. The complainant's identity must remain confidential.

1. The complaint must specify the alleged reasons why the M/WBE firm is ineligible. The complaint may include any information or arguments supporting the complainant's assertion that the firm is ineligible and should not continue to be certified.

2. The Authority shall notify the firm against which the complaint was lodged and must provide such firm with a copy of the complaint, and shall notify the firm that the firm may submit information and documentation to the Authority refuting the complaint within fifteen (15) days from receipt of such notification.

3. Upon receipt of such written complaint, the Authority shall review its records concerning the firm, any material provided by the M/WBE firm and the complainant, and other available information. The Authority may request additional information from the firm or conduct any other investigation that it deems necessary.

4. After conducting a review, the Authority shall issue the complainant and to the M/WBE against which the complaint is lodged a written determination of whether or not the complaint was legitimate and whether or not the certification of the subject M/WBE will remain or whether the Authority intends to initiate decertification proceedings by presenting such complaint to the PRC for review and decision.

**9. Loss of Certification from the MRCC member agency which provided the underlying DBE certification, as applicable.** If loss of certification as a DBE is due solely on changes in the firm's size standard and personal net worth that render the firm ineligible as a DBE, such loss of certification shall have no impact on the firm's Certification as an M/WBE. However, if loss of DBE certification is for any other reason, the Authority may initiate decertification proceedings by presenting such complaint to the PRC for review and decision.

**10. Maintaining Certification.** Certified M/WBE firms must annually upload, via the certification compliance and management system ("CCMS"), a complete copy of the firm's most recent tax return and their No Change Affidavit, affirming that there have been no material changes in the certified business entity since Certification was granted.

a. The Authority shall inform the M/WBE of this requirement at least thirty (30) days prior to the anniversary date and shall include the necessary form with the reminder notice.

42

b. The M/WBE shall submit the Annual No-Change and a complete copy of the firm's most recent tax return no sooner than the anniversary date and no later than thirty (30) days after the anniversary date.

c. If the M/WBE fails to submit the Annual No-Change Affidavit and a complete copy of their most recent tax return within the applicable timeframe, the Authority shall send a reminder notice advising the M/WBE that failure to submit within fifteen (15) days of receipt of the reminder notice will result in the Authority's recommendation for decertification of the firm's M/WBE eligibility.

**G. Program Review Committee Proceedings.**

**1. Purpose.** The purpose of the Program Review Committee ("PRC") is to review and make rulings on Authority recommendations when such decisions involve the following:

(a) Approval or denial of an Application for Certification as an MBE and/or WBE; and

(b) Decertification of an MBE and/or WBE's certification;

2. **Program Review Committee Composition.** The PRC shall consist of the following five members with voting rights to be appointed by SLDC for a period of time established by SLDC.

(a) One member with demonstrated experience in the field of finance and accounting;

(b) One member with demonstrated experience in the field of engineering and construction;

(c) One member with demonstrated experience with M/WBE matters;

(d) One member dedicated to the advancement of minorities and/or woman; and

(e) One member with demonstrated experience with business associations and knowledge of business structures.

(f) The committee shall elect a chairperson from among its members.

(g) The Committee shall elect a secretary among its members. The secretary shall record in the minutes the time and place each meeting of the PRC, names of PRC members present, all official acts of the PRC, and the votes of each member.

**3. Authority Action and Recommendation(s) to PRC.** The Authority shall submit a recommendation of a denial or an approval to the PRC explaining the reasons for the recommendation and proposed action.

**4. Participation Eligibility.** An M/WBE firm shall remain eligible for participation in City Contracting Opportunities during the pendency of decertification proceedings. An

M/WBE firm's participation shall continue to be counted until the PRC has made a final determination regarding the firm's eligibility.

**5. Program Review Committee Notification.** Prior to the PRC, an Applicant firm will be notified of the PRC meeting and their rights, which are as followed:

a. The right to provide a response and evidence to rebut the Authority's recommendation directly to the PRC. If the Applicant chooses to provide evidence to rebut the Authority's recommendation, such evidence cannot be new or additional information that was not provided at the time of the Certification review.

b. The right to request a postponement until the next PRC meeting, for the purpose of preparing a response to the PRC;

c. The right to make a brief oral presentation at the meeting;

d. The right to have others with information pertaining to the recommendation make a brief oral presentation at the meeting; and

e. The right to be represented by legal counsel at the meeting. The Applicant firm will provide advance notice to the Authority if the Applicant firm plans to be represented by legal counsel at the meeting.

**6. Ex Parte Communication with the PRC Prohibited.** Neither the Authority nor the firm may communicate with the PRC or any member of the PRC regarding the merits of the matter without the knowledge of the other party for the duration of the proceedings, except in the course of PRC meetings.

**7. Conduct of the PRC Meetings.** Conduct of the PRC meetings are as followed:

a. A majority of PRC members in attendance at the meeting place are required for a quorum. If a quorum is not present, the Chair shall adjourn the meeting to a subsequent date and time.

b. The PRC shall not be bound by any rules of order, evidence or procedure in its meetings, hearing or investigations, except such as it may itself establish or as are expressly established in these Rules.

c. The subject M/WBE may present a rebuttal and supporting evidence within time limits prescribed by the PRC. Such time limits may not be less than the amount of time allowed to the Authority.

d. Following the presentation of testimony, the PRC shall deliberate, considering all the facts and evidence, viewed as a whole.

e. The PRC may deliberate in open session or may vote to deliberate in a closed session as appropriate pursuant to Section 610.021 RSMo. in accordance with applicable law.

f. If it appears that the evidence is incomplete or unclear with respect to matters likely to have a significant impact on the outcome of the case, a majority of the members of the PRC present and voting may vote to remand to the Authority or hold the record open for further clarification by the parties until the next PRC meeting.

g.  Reasonable accommodations will be made for those persons with disabilities with forty-eight (48) hours' notice to the PRC.

**8. Certification Re-application.** If the PRC upholds the recommendation for denial of Certification, the Applicant shall not be permitted to reapply for Certification until six (6) months from the date that the Applicant originally submitted an application has elapsed unless:

a. The Applicant appeals such denial as provided below.


**H. Willful Noncompliance in General- Penalties and Sanctions.**

**1. Knowingly and Willful Noncompliance.**  If, at any time following a preliminary investigation, the Authority or Contracting Agency has reason to believe that any firm or representative of a firm, including an M/WBE firm, general contractor, consultant, supplier, subcontractor and/or developer, has knowingly and willfully provided false, erroneous, misleading or incorrect information or statements in connection with any material aspect of the Program or these Rules (collectively, "Misrepresentations"), such matter shall be immediately investigated by the Authority.


**I.   M/WBE Decertification**

**1. Grounds for an M/WBE Decertification.** The Authority may recommend that the PRC decertify an M/WBE firm, if any of the following circumstances are documented:

a. Failure to submit a timely annual No-Change Affidavit with supporting documentation;

b. After the M/WBE's submission of material changes in its ownership and/or control, the Authority finds that such M/WBE is no longer eligible for certification.

c. The M/WBE otherwise fails to meet the requirements for continued certification eligibility under these Rules;

d. The M/WBE is no longer a Local firm;

e. The M/WBE fails to timely notify the Authority within thirty (30) days of material changes in its ownership and/or control;

45

f.  Information relevant to eligibility that has been concealed or misrepresented by the M/WBE firm;

g.  Information or evidence not available at the time of Certification, which renders the M/WBE firm ineligible;

h.  A documented finding that the determination to certify the firm was factually erroneous.

i.  The M/WBE firm receives three (3) complaints of commercially useful function ("CUF") violations within a twelve (12) month period.

**2. Process of an M/WBE Decertification.** The Authority may recommend that the PRC decertify an M/WBE firm based upon the aforementioned grounds.  The Authority must provide the M/WBE firm with a written notice of the recommendation and the reasons, including specific references to the evidence, that supports the Authority's recommendation.

a.  Upon providing a written notice and the reasons that support the recommendation for decertification to the M/WBE firm, the M/WBE firm may provide additional evidence to rebut the Authority's recommendation. After the M/WBE firm is provided notification and an opportunity to rebut, the Authority must investigate and review the additional evidence. If there is reasonable cause to believe that the M/WBE firm is still ineligible, the Authority must provide a notice setting forth the reasons for the proposed determination. The notice must inform the M/WBE firm of the Authority's findings and the date and time of the PRC hearing.

b.  The PRC hearing must follow the procedures of section G(7)(a)-(g) under these Rules. In such a proceeding, the Authority has the burden of showing, by a preponderance of the evidence, that that firm does not meet the eligibility requirements set forth in these Rules.

c.  A written, verbatim record of the hearing will be made at the expense of the Authority.

d.  A written decision by the PRC setting forth the grounds and reasoning for the decision, including the availability of an appeal, must be mailed to the firm within 30 days after the PRC hearing.

**3. Effects of Decertification.** If a firm's M/WBE certification has been removed through the process of decertification, the effects are as followed:

a.  When a general contractor, consultant, prime contractor, supplier, and/or developer has made a commitment to using, or the City has made a commitment to using an M/WBE general contractor, prime contractor, consultant, general contractor, supplier, and/or developer whose Certification has been removed pursuant to this section, but a contract or subcontract has not been executed before

46

the Program Review Committee issues the notice of the removal of eligibility decision provided for herein, the participation of the firm whose certification has been removed shall not be credited toward the Goals.

b. If a City Contracting Agency or a general contractor, consultant, prime contractor, supplier, or developer has executed a contract or subcontract with a firm whose Certification has been  removed before the Authority has notified the firm of its ineligibility and before the Authority has updated the removal of eligibility in the M/WBE directory, the City, the general contractor, consultant, general contractor, supplier, or developer may continue to use the firm on the contract and may continue to receive credit toward the M/WBE Goals for the firm's work.

c. Except for circumstances where a firm is decertified for failing to submit a timely affidavit of no change, a firm that is decertified shall not be permitted to reapply for Certification until twelve (12) months from the date the firm's M/WBE eligibility has been removed has elapsed.

**J. Appeals.**

**1. Administrative Review Officer Qualifications**. The Director of the Airport Authority may appoint at least two Administrative Review Officers to serve on a rotating basis. Such Administrative Review Officers shall be managers or professional employees of the City of St. Louis or an agency or affiliate thereof, provided, however, that in no event shall an Administrative Review Officer be involved in the day-to-day operations of the Program or a member of the PRC.

**2. Administrative Review Officer Trainings.** Administrative Review Officers are required to complete annual trainings directed towards the rules, guidelines, and processing of M/WBE / certifications.

**3. Grounds for Appeal.** If a firm is denied certification or its eligibility is removed via the process of Decertification, it may appeal the PRC's decision by filing an appeal with the Administrative Review Officer designated by the Authority.

a. The Authority shall provide the name of the Administrative Review Officer to whom an appeal shall be referred, together with the address, telephone number, and e-mail address for such person, to any party requesting such information.

**4. Form and Timing of Appeal.**  The aggrieved party must submit its Request for Administrative Review (attached as Appendix 1), in writing, to the Administrative Clerk with a copy to the Authority, within thirty (30) calendar days following the date of the PRC's adverse decision.  Such filing shall include:

a. A written statement of the aggrieved party's reasons for believing that the decision was in error and should be reversed, together with documentation supporting the appellant's position; and

47

b. A copy of the decision of the Authority or Program Review Committee being appealed, together with all supporting documents submitted by the Authority to the Contracting Agency and the PRC, as applicable, in conjunction with the application or decision.

c. If desired by the aggrieved party, and if applicable, the aggrieved party may also provide evidence that the aggrieved party has cured any circumstance that resulted in a denial of or removal of eligibility.

i. the evidence provided must be such that the Authority will have a reasonable opportunity to review and make a determination.

d. Three copies of the Request for Administrative Review and all supporting documentation.

**5. Filing Late Appeals.** The Administrative Review Officer may accept an appeal later than 30 calendar days after the date of the decision if such Officer determines that there was good cause for the late filing of the appeal. It shall be the aggrieved party's responsibility to submit a written request for such extension along with the appeal to the Administrative Review Officer as soon as practicable along with an explanation and any related supporting documentation regarding the reasons for the delay.

**6. Status During Appeal Process.** Until the Administrative Review Officer makes a decision with respect to the appeal, the decision of the Authority and/or Program Review Committee, as applicable, shall remain in effect.

**7. Ex Parte Communication with the Administrative Review Officer Prohibited.** No employee of the Authority, no member of the PRC and no person associated with the appellant in any way shall communicate with the Administrative Review Officer regarding the merits of the matter without the knowledge of the other party for the duration of the appeal process.

**8. Notices Required and Responses Permitted.** Upon receipt of a timely filed appeal, the Administrative Clerk shall provide notice to the appellant, acknowledging receipt of its appeal. The Administrative Clerk must provide to the Authority a complete copy of the appeal submitted by the appellant. The Authority shall have thirty (30) calendar days from receipt of the notice of appeal within which to prepare and submit a response to the Administrative Review Officer. Such response shall be based upon and include only such information as was in the Authority's and/or PRC's possession at the time of the decision being appealed and shall not include a reinterpretation or changed opinion of information available at the time of the decision being appealed.  Such response may include:

a. A narrative statement explaining the reasons the decision of the Program Office and/or Program Review Committee should not be reversed; and

b. Copies of evidence in the Authority's/PRC's possession at the time of the decision being appealed demonstrating why the decision was appropriate.

48

9. **Appellant Reply Permitted.**  Upon receipt of the Authority's response, the appellant may reply to such response, provided that such reply is submitted within fifteen (15) calendar days following the date a copy of the response was received by the Authority. Such response shall only address issues set forth in the Authority/PRC response and shall not introduce any new evidence, except that, in submitting a reply, the Appellant may introduce evidence that Appellant has cured any circumstance that resulted in a denial of or removal of eligibility via the process of Decertification.

10. **Authority/PRC Rebuttal Permitted.** Upon receipt of the appellant's reply, the Authority/PRC may, within (15) calendar days following the date a copy of the reply was received, submit a rebuttal to any statements contained in the appellant's reply.  Such rebuttal shall only address issues set forth in the appellant's reply and shall not introduce any new evidence, except that if the Appellant has introduced evidence that Appellant has cured any circumstance that resulted in a denial of or removal of eligibility, the rebuttal of the Authority/PRC may also address such evidence.

11. **Extensions of Time.** The Administrative Review Officer may extend any time period set forth in this section upon the written request of a party and a showing of good cause, provided, however, that no extension shall be granted for a time period in excess of forty-five (45) days.  The Administrative Review Officer shall notify all parties in writing of a decision to grant any such extension.

12. **Administrative Review.** The Administrative Review Officer shall conduct a de novo review of the matter based solely on evidence submitted to the Authority during the certification review process and shall, within fifteen (15) days following the submission of an appeal and all responses permitted by Section D above (or the expiration of all time periods for the filing of such responses), make a decision with respect to the appeal based solely on the evidence.

    a. The Administrative Review Officer shall base all decisions on the status and circumstances existing as of the date of the Authority's/PRC's decision, except that the Officer shall also consider evidence regarding whether the Appellant has cured any circumstance that resulted in a denial of or removal of eligibility if the Appellant submits such evidence.

    b. The Administrative Review Officer shall disqualify any evidence based on the Authority's reinterpretation or changed opinion of information available to the Authority at the time the decision being appealed was made unless such evidence relates to the new evidence submitted by Appellant during the appeal process that Appellant has cured any circumstance that resulted in a denial of or removal of eligibility.

    c. If it appears that the evidence is incomplete or unclear with respect to matters likely to have a significant impact on the outcome of the appeal, the Administrative Review Officer may remand the matter to the Authority or the PRC as applicable, with a request for clarification or augmentation of the

evidence and/or decision before making a finding.  The Administrative Review Officer may also remand a matter to the Authority or PRC for rehearing and re-deliberation consistent with these Rules.

**13. Administrative Review Decisions and Notice.** If the Administrative Review Officer does not remand the matter to the Authority for additional investigation, based upon presenting new evidence that the Appellant has cured any circumstance that resulted in a denial of or Decertification, the Officer shall, after reviewing the evidence, issue a decision. The Administrative Review Officer's decision shall state whether or not the actions/decisions of the Authority and/or PRC should be reversed or upheld.  The Administrative Review Officer shall provide written notice of its decision to the appellant, to the Authority, and, as applicable, to the PRC promptly after such decision is made.  Such notice shall include the decision and the reasons for the decision, including specific references to the regulations and evidence presented that supports each reason for the decision.  If the Administrative Review Officer rules in favor of the appellant, the notice shall direct the Authority and/or PRC, as applicable, to take steps to reverse the original decision.

**14. Decisions Shall Be Administratively Final.** All decisions of the Administrative Review Officer shall be administratively final and shall be deemed to be the final decision of the City.  An aggrieved party may seek review of this decision pursuant to Section 536.150 RSMo.  and this shall be an aggrieved party's exclusive judicial remedy.

**15. Authority Action Following Administrative Review Officer's Decision.** The Authority and/or PRC, as applicable, shall take the action(s) directed by the Administrative Review Officer, if any, as quickly as possible but in no event shall more than five (5) calendar days elapse from the time of such notice before such direction is implemented.